G.J. LEASING CO., INC., d/b/a Cahokia Marine Service, Slay Transportation Co., Inc., S.I. Warehousing Co., Inc., d/b/a Bi–State Warehousing, and S.I. Enterprises, L.P., Plaintiffs,

v.

UNION ELECTRIC CO., Defendant.

Civ. No. 91–158–JPG.

United States District Court,
S.D. Illinois,
Benton Division.

June 6, 1994.

542

Joseph G. Nassif, Ronald L. Hack, Linda Tape, Coburn & Croft, St. Louis, MO, for plaintiffs.

Paul Venker, Edwin Noel, Susan Knowles, Armstrong, Teasdale, Schlafly & Davis, St. Louis, MO, for defendant.

## MEMORANDUM OPINION

GILBERT, Chief Judge:

This matter is before the Court following a bench trial on the plaintiffs', G.J. Leasing Company, Inc., d/b/a Cahokia Marine Service, and S.I. Enterprises, L.P., claim against the defendant, Union Electric, seeking damages for violations of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq. The relief sought by the plaintiffs include damages equalling the plaintiffs' response costs incurred as a result of the release or threatened release of hazardous substances at the Site, plus interest, as well as attorney's fees and costs; and a declaratory judgment in the plaintiffs' favor and against Union Electric ("U.E.") holding that U.E. is liable for all response costs to be incurred by the plaintiffs in the future. The plaintiffs also seek damages in Count IV, an ultrahazardous activity claim, which alleges that U.E.'s disposal of hazardous substances through the sale of the Sauget Site for the purpose of demolition was an abnormally dangerous and ultrahazardous activity.[1]

---

1. This case was originally a five count cause of action, only Counts I and IV remain. Count II was a common law negligence claim premised on U.E.'s duty to the general public and to future owners of the Sauget site to exercise reasonable care in disposing of the hazardous substances on

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 9601 et seq. After considering the testimony, exhibits, arguments of counsel, and supporting memoranda, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).

## I. Findings of Fact

The following facts have been stipulated to by the parties:

1. The plaintiff, S.I. Enterprises, L.P. is a Missouri limited partnership.

2. The plaintiff G.J. Leasing Company, Inc., d/b/a Cahokia Marine Service ("CMS") is a Missouri corporation.

3. The defendant, Union Electric ("U.E.") is a Missouri corporation.

4. U.E. owned a power generating facility on property located at # 1 Monsanto Avenue in Sauget, Illinois from 1923 until 1979.

5. The electric generating equipment was located in the power plant.

6. On December 21, 1978, U.E. entered into an executory contract with G & S for the sale of the Site along with certain of its equipment.

7. The sale was contingent upon U.E. obtaining consent of the Illinois Commerce Commission ("ICC").

8. On March 29, 1979, Slay Warehousing Co., Inc., a Missouri corporation, entered into a Letter of Intent with G & S Sarnelli, for the purchase of the Sauget Site. Pursuant to the Letter of Intent, G & S and Sarnelli were to sell the real estate to Slay Warehousing and were to retain the right to remove for salvage those materials that were not necessary for the operation of a tank farm and trucking operation.

9. Sometime after April 23, 1979, and before May 29, 1979, Slay Warehousing assigned its rights in the real estate contract to Eugene P. Slay and Joan Slay.

10. On May 29, 1979, U.E. sold the property to G & S for nearly $1.6 million. On the same day, G & S sold the property for $1,000,000.00 to Eugene and Joan Slay. All property was sold "as is."

11. On or about February 3, 1988, the Slays transferred the Cahokia Site to S.I. Enterprises, L.P. by warranty deed.

The following facts are findings made by this Court:

1. Eugene Slay is the Chief Executive Officer of all the plaintiff entities. He, together with members of his family, own and control all of the plaintiff entities. Slay Industries is the umbrella organization for the plaintiff entities. (Testimony of E. Slay).

2. Mr. Slay began his career working for his father's business, Bee Line Trucking, which specialized in local transportation and delivery services. Eventually, Slay expanded his father's operations into tankage, trucking, barging and warehousing. (Testimony of E. Slay). Judge Paul Simon, Mr. Slay's long time attorney, described Eugene Slay as a sophisticated and knowledgeable businessman. Slay's companies have stored and transported a variety of other hazardous substances over the years, including such materials as caustic potash, ammonium nitrate, benzene and sulfuric acid. (Testimony of Glen Slay).

3. It is Mr. Slay's practice to rely on certain key employees, such as Ted Tahan, Paul Simon, and Ray Stratmeyer, in managing the day to day operation of his enterprise. (Testimony of E. Slay). These employees are also knowledgeable and experienced businessmen.

the Sauget site and/or to disclose the unreasonable risk created by the disposal to subsequent vendees. Count III was a willful and wanton conduct claim premised on the same conduct as Count II. The Court granted summary judgment in favor of the defendant on these two counts on July 9, 1993. See G.J. Leasing, Co., Inc. v. Union Electric, Co., 825 F.Supp. 1363 (S.D.Ill.1993). Count V was brought pursuant to the Resource, Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6903, et seq. This count requested the

Court to enjoin U.E. from further violations of RCRA; enter judgment in the plaintiffs favor and order U.S. to notify the proper Illinois state agency of the existence of the underground storage tanks at the Sauget site and to properly close the tanks; and to order U.E. to pay the plaintiffs' costs of this litigation. This claim was dismissed by the Court on December 17, 1993, upon a finding that the plaintiffs no longer had standing to pursue this claim, 839 F.Supp. 21.

4. For more than fifty years, U.E. generated electricity at its Cahokia Power Plant located on a 52 acre tract along the eastern bank of the Mississippi River in Sauget, Illinois. The predominant land use in the area surrounding the Site is industry, including chemical processing and toxic waste processing. (Defendant Exh.FD). However, some of the Site's other neighbors include nightclub establishments with numerous patrons and employees.

5. The Court agrees with the plaintiffs' expert David Schau's testimony that, based upon his review of various U.E. health and safety documents, U.E. appeared at all times to comply with OSHA regulations regarding worker exposure. Schau further testified that he saw no evidence that U.E. violated NESHAP or OSHA regulations during its ownership of the Site. (Testimony of D. Schau).

6. U.E. knew asbestos fibers were hazardous to worker health and undertook two asbestos surveys in 1973, of Cahokia employees who had to work with asbestos. (Plaintiffs' Exh. 8). U.E. knew, as a result of these surveys, that any handling of asbestos could cause exposures above levels set by the government. U.E. also knew that the protective gear worn by workers and methods to control releases (such as spraying water) were ineffective, under conditions where dust was prevalent, in reducing asbestos exposure to a safe level. (Plaintiffs' Exh. 8).

7. During the plant's operation, U.E. was meticulous about the condition of its plant, its cleanliness and its repair. As a matter of corporate policy, U.E. imposed strict maintenance requirements on its facilities. (Testimony of R. Weidenbenner; E. Dille). Insulation on pipes was always well maintained and was loose only during repair. Transite boards were always intact and "somebody would have gotten fired" if the plant was left in a disheveled condition. (Testimony of R. Carter; R. Weidenbenner). Similarly, equipment was serviced regularly and in such a manner as to minimize damage to the equipment or the facility.

8. The buildings on the Site include a large power plant used at one time by U.E. to generate electricity, several large above-ground storage tanks, four underground storage tanks, a warehouse, a truck maintenance facility, and an office building. The power plant is partially built out into the Mississippi River.

9. The power plant is divided into three sections—the boiler, the turbine room, and the river bay. There were 24 boilers in the plant and six turbine generators. The turbine generators and boilers were fixed and bolted in place. (Testimony of R. Carter, R. Weidenbenner, C. Kind, M. Gatewood).

10. Without repeating all of the testimony regarding all of the systems in the plant, the Court finds the following to be an accurate description of the systems in the power plant. There were two precipitator systems located on the roof of the building which had been out of use since 1972, when the plant converted from coal to oil. There were transformers located both inside the building and on the outside deck of the river bay. The exterior transformers transported power under the Mississippi River and to the eastern shore of Missouri through submarine cables. All of the transformers contained heat transfer oils, but with the exception of two transformers on the roof relating to the precipitator system and two pole mounted transformers which were installed by U.E. during its plant decommissioning, none of the transformers were contaminated with polychlorinated biphenyls (PCBs). (Testimony of R. Carter) (Defendant's Exh. CX). There were valves in the areas of the power plant which were below water level, which prevented flooding into the plant. (Testimony of R. Carter). Sump pumps also prevented water from collecting in the lower levels of the basement. (Testimony of P. Brendel). There were also numerous wires, connectors, and other electrical equipment, including long copper bussbars which transported electrical current from the generators to the transformers for distribution within the U.E. system. Some of this electrical equipment also contained non-PCB contaminated heat transfer fluids.

11. Because heat was generated in the production of electricity, it was common for power plants to contain insulating materials throughout the plant to protect workers and

to save heat loss. This insulation would appear on duct work, steam lines, buss-bars, as well as within large pieces of electrical equipment. In the Cahokia plant, as was common with other power plants, much of this insulation contained asbestos. In addition, floor tiles, roofing materials, fire brick, pipe insulation and transite boards were manufactured with asbestos containing material, and were found throughout the Cahokia facility. (Testimony of R. Carter; R. Weidenbenner).

12. When Cahokia was built, it was the principal base load electrical generating plant which carried power throughout the entire U.E. system. After the Labadie and Rush Island Power Plants became operational, however, Cahokia was used for peak period only. (Testimony of R. Baudendistel). By 1975, Cahokia had become the least efficient plant in U.E.'s system. Mr. Earl K. Dille, President of U.E., testified that given the amount of electricity capable of production at Cahokia, it did not make economic sense to continue operation of the Cahokia plant. The plant's production was limited to 300 megawatts, less than one-fourth the production capacity of a single generator in one of U.E.'s newer plants. (Testimony of R. Weidenbenner; R. Baudendistel, E. Dille). In addition, load forecasts for 1976–1977 indicated a reduced demand for electricity. (Plaintiff's Exh. 10).

13. Accordingly, in 1975, U.E. conducted an economic feasibility study of the Cahokia Power Plant which contemplated the retirement of the plant through a step-by-step program. (Testimony of R. Baudendistel). The decision to decommission the Site was based on the plant's age, maintenance and labor costs. The plant had to be fully staffed even if operated only sporadically during peak periods. (Testimony of R. Baudendistel).

14. As a result of the study, on October 1, 1975, Mr. Dille approved the implementation of the phased unmanning of the Site. The target date for decommissioning and retirement was 1977. (Plaintiff's Exh. 43).

15. U.E.'s fundamental reason for retirement of the Cahokia Power Plant was its age. Most equipment at the plant was 40 to 50 years old and generated large maintenance costs. Spare parts for this equipment were expensive and increasingly difficult to procure, and it required an inordinate amount of manpower to operate and maintain. The old equipment also could not be economically fitted with necessary environmental controls. (Plaintiff's Exh. 15, p. 10). In fact, the manufacturers were no longer making the spare parts for the turbine. (Testimony of R. Baudendistel).

16. The presence of asbestos in structural components or other hazardous substances was not a factor in U.E.'s decision to decommission the Cahokia Power Plant. (Testimony of R. Baudendistel, E. Dille, M. Gatewood).

17. By April of 1976, the first and second phases of the Cahokia Unmanning were completed and staffing at the plant was reduced accordingly. (Plaintiff's Exh. 11). Bob Weidenbenner, plant superintendent at Cahokia, testified that prior to completion of the phased shutdown, the plant was modified for close down by draining boilers, water storage systems and piping. Equipment was placed in a mothball status. (Defendant's Exh. CE; Plaintiff's Exhs. 12 and 191; Testimony of R. Weidenbenner). However, the power plant was left in operational condition and capable of generating electricity. (Testimony of R. Weidenbenner).

18. In October 1976, the Cahokia Power Plant was completely unmanned, heat was turned off, and the gate was locked. (Weidenbenner Trial Test., Plaintiffs' Exh. 71).

19. In 1977, the substation in the river bay section was closed, but U.E. continued to maintain the property, although it ceased operational maintenance and capital expenditures. Since the Engineering and Construction Department had no staff maintenance personnel, this task was contracted out. U.E. entered into a servicing contract with a security firm to protect the property and hired an electric company to perform maintenance at the Site on an as needed basis. (Plaintiffs' Exhs. 10, 12, 13, 43; Testimony of E Dille, R. Baudendistel). U.E. also installed provisional electrical service to provide necessary lighting and to keep sump pumps

in the lower level of the plant operational. (Plaintiffs' Exhs. 181, 47).

20. After the Cahokia Power Plant had been decommissioned, its economic viability as an operating power plant within the U.E. system continued to decline. U.E. considered other alternatives for the Site, including using it as a training center, and even the possibility of developing the Site for a nuclear power plant. U.E. did not know, however, what the value of the Site might be if sold "as is" or if sold after all buildings were demolished and, therefore, it decided to put out bid packages to test the market for the Site. (Testimony of E. Dille, R. Baudendistel).

21. U.E.'s Purchasing and Real Estate Departments coordinated the development of the bid request package. The bid package was designed to solicit a variety of proposals in an effort to create the best market and highest value for the property. Bidders were required to tour the plant and to make their own evaluation as to the value of the facility. (Plaintiffs' Trial Exh. 70; Testimony of M. Gatewood).

22. The bid invitation contemplated essentially four alternatives: (1) sale of the property with the successful bidder assuming full responsibility and liability; (2) sale of equipment with demolition of the power house structure and restoration of the Site; (3) salvage only—all mechanical and electrical equipment to be removed; and (4) razing of structures and restoration of the Site. The preferred alternative was an outright sale of the property with the new buyer assuming full responsibility and liability because by this time it was thought that the property probably would not be needed in the U.E. system, but the Company was still open to the other alternatives. Contractors were required to "visit the Site and become thoroughly familiar with existing conditions to which the work [was] in anyway related and become fully informed as to the extent and character of the work required." The bid deadline was March 10, 1978. (Plaintiffs' Exh. 17).

23. The term "salvage" simply meant used equipment which retained asset value. It did not connote equipment that was value-less or incapable of use. (Testimony of M. Gatewood, C. Kind). U.E. envisioned that a prospective bidder who was interested in salvaging mechanical and electrical equipment would dismantle and disconnect the equipment for reuse or resale. (Testimony of M. Gatewood, C. Kind, L. Kurowski, E. Dille). U.E. believed that there were many potential purchasers for the equipment at the Site, including other power companies, both in the United States and in South America, as well as corporate users of large amounts of electrical power.

24. The bid specification contained a listing of principal equipment at the Site including its manufacturer, weight, and age data. (Plaintiffs' Exh. 16). U.E. did not guarantee the accuracy or completeness of the information contained in the bid specification and the bidder assumed the responsibility for establishing all dimensions, the exact number, size, model number, make and condition and age of all items. In addition, no consideration was granted for "any misunderstanding of the Site conditions, materials or equipment, construction or features of the structures." (Plaintiffs' Exh. 16).

25. U.E. made no effort to hide the condition of the property. The property was sold "as is" which indicates that the seller was not making any warranty. The fact that asbestos, PCBs and other hazardous substances may have been present at the Site was specifically disclosed to prospective bidders in the bid specification. (Testimony of M. Gatewood). Moreover, U.E. required all bidders to visit the Site and accommodated all prospective purchasers during their Site inspections.

26. None of the bidders ever questioned U.E. regarding the presence of PCBs or asbestos in the facility. (Testimony of C. Kind). G & S Motor Equipment Co. ("G & S"), the successful bidder, was well aware of the presence of asbestos in the plant, was aware of asbestos regulations at the time and specifically contemplated the cost of asbestos removal in making its bid. (Newmark Depo. p. 47; Sarnelli Depo. p. 42). The information provided in the bid request package was adequate to allow bidders to submit an ap-

propriate bid. (Sarnelli Depo. pp. 19–20). Slay testified that he was well aware of the term "as is", that he had sold and purchased trucks and equipment in that manner, and that as he understood the term to mean the buyer accepted all responsibility for the property, whatever its condition, once it was purchased. (Slay Depo. 3/30/92 pp. 36–39). Slay also expected his attorneys and others in his employ to read the bid specification and to become fully familiar with its terms.

27. The bid specification was sent out to potential bidders suggested by other utility companies, companies discovered by searching trade publications, companies who had previously expressed an interest in the Site, scrap dealers, demolition companies and, also local companies who might be interested in riverfront access. (Testimony of C. Kind, M. Gatewood; Plaintiffs' Exh. 18). Other companies, such as Slay Industries, contacted U.E. to receive the bid package. (Defendant's Exhs. GM, GN). Ultimately, 82 companies received copies of the bid package. (Plaintiffs' Exh. 20).

28. Carl Kind toured the entire plant with prospective bidders from the lower levels to the roof. (Testimony of C. Kind). In his tours of the plant, Kind never noticed any leaks in the roof, torn insulation, disrepair or broken windows. He described the conditions as neat and orderly. (Testimony of C. Kind). He answered each bidder's questions as best as he could and he never tried to hide any equipment or condition from any prospective bidder.

29. During March of 1978, the Mississippi River rose to flood stage and a leak developed in the condenser pits, flooding the lower level of the power plant. (Testimony of P. Brendel). Prospective bidders, including Mr. Slay, were advised of the flood and inspection tours suspended. (Plaintiffs' Exh. 200). Paul Brendel testified that flood waters reached as high as 25 grade. After the flood, U.E. hired a contractor to clean up the basement. This cleaning was done with firehoses. The water was then filtered and pumped from the basement and discharged into a basin on the property. Oil floating on top of the water was suctioned by hose and removed. Motors for the sump pumps were removed, repaired and reinstalled in the condenser pits. (Plaintiffs' Exh. 57). Brendel described the basement as being in broom clean condition after the clean-up. (Testimony of P. Brendel).

30. G & S visited the Site three separate times before submitting its bid. During its initial visit to the Site, G & S could not view the lower level of the plant because of the flood. Mr. Newmark, G & S's President, testified that he made a second trip to the Cahokia Power Plant specifically so that he could view the basement area and equipment. Newmark walked through the plant a third time the day before G & S submitted its bid to verify the condition of the plant. (Newmark Depo. p. 37). In addition, Sarnelli Brothers, Inc. ("Sarnelli"), G & S's undisclosed joint venturer, visited the Site on numerous occasions to evaluate the facility and its contents. (Sarnelli Depo. pp. 8–9).

31. Mr. Slay and others in his organization also made multiple tours of the facility before making their bids. (Plaintiffs' Exh. 96). During Slay's personal tour of the facility, even though he never got out of his car to inspect the plant closely, he described the facility as being in excellent condition—a "nine" on a scale of one to ten and said that it was a "first class facility." Slay was impressed with the cleanliness of the property, referring to it as "meticulous", "spotless", "exceptionally clean", (Slay Depo. 3/30/92, pp. 25–29, 60), and he did not feel any particular hazard in walking through the facility. (Slay 3/30/92 Depo. p. 60; Testimony of E. Slay).

32. As noted, bids on the Cahokia property were solicited from 82 firms and resulted in 19 responses. Fourteen companies elected to bid on the entire property and improvements, with bids ranging from $47,000 to nearly $1.6 million. Four bidders submitted bids in excess of $1 million for the entire property on an "as is" basis. The sale price was established through an open and competitive market in which plaintiffs themselves participated. Maury Gatewood reviewed the analysis and bids.

33. G & S submitted the highest bid of nearly $1,600,000, which it considered to be a fair price for the property. (Newmark Depo.

pp 13–14). G & S's proposal was to purchase the "whole package"—the entire bundle of rights for the property. G & S's bid was the best proposal and would generate the most revenue to U.E. (Testimony of M. Gatewood).

34. On September 19, 1978, U.E. notified G & S that it was the successful bidder. (Defendant's Exh. Y; Plaintiffs' Exh. 69). Shortly thereafter, U.E. petitioned the Illinois Commerce Commission for approval of the sale of the Cahokia Power Plant to G & S. At a hearing before the ICC, Dick Shea, a Senior Buyer in the Purchasing Department, testified that G & S had no intention of demolishing the power plant building. Shea testified that he had spoken to the president of G & S who informed Shea that G & S intended to sell or lease the tank farm and to retain the plant structure and operate it for warehousing or as an industrial park. (Plaintiffs Exh. 15, pp 51–52) (Sarnelli Depo. pp. 9–10). These were, in fact, Sarnelli's intentions as he believed the structure and property had great value as a warehousing facility due to its unique location. This is also what aroused Slay's interest in the Site. He understood that the Site could be of great value as an "intermodel facility" incorporating warehousing with transportation of materials by barge, rail and truck. (Testimony of P. Simon; E. Slay). However, U.E. was also aware that these plans would require some demolition of portions of the facility. (Plaintiffs' Exhs. 15, 28).

35. On December 21, 1978, U.E. entered into an executory contract with G & S for the sale of the Cahokia Site along with certain of its equipment. (Defendants Exh. AL). U.E. notified Slay Industries that G & S was the successful bidder. (Plaintiffs' Exh. 97).

36. Mr. Slay ultimately contacted Sarnelli Bros. and discussed purchase of the property. (Testimony of Eugene Slay). The discussions resulted in a letter of intent entered between Slay Warehousing Co., Inc. and G & S and Sarnelli dated March 29, 1979. (Stipulated Facts). Pursuant to the letter of intent, Slay Warehousing was to purchase the real estate and Sarnelli was to retain the right to remove for salvage those materials that were not necessary for the operation of a tank farm and trucking operations. (Plaintiffs' Exh. 98).

37. On April 2, 1979, Sarnelli informed Slay that Sarnelli and G & S had received a bona fide offer of 1.1 million dollars for the property. (Defendants Exh. AU). Under the terms of the option, Slay had ten days in which to exercise or waive its right to purchase the property.

38. So that Slay could complete his research into "all the factors involved" regarding the property, Slay requested an extension of the option deadline to April 25, 1979. (Plaintiffs' Exh. 95). Slay hired Ted Jockenhoefer, an engineering consultant with the engineering and architecture firm of Warren & Van Praag, Inc. to evaluate the property. Slay and Simon both testified that they had confidence in Jockenhoefer and his firm from having worked with them on other transactions and that they believed him to be a competent engineer. (Testimony of P. Simon; E. Slay). Jockenhoefer contacted U.E. regarding the property and informed Larry Kurowski, a Senior Real Estate Representative, that Slay had an option to purchase the property from G & S and that he had been hired to perform a feasibility study. Slay wanted to use the plant property as a trucking terminal including an office building and truck servicing building. (Defendant's Exh. AV). The entire Site (mooring rights, tank farm, power plant building) all had value to Mr. Slay. (Testimony of E. Slay).

39. On April 23, 1979, Slay Warehousing, entered into a sale contract with G & S for the purchase of the Cahokia Site and improvements. In the sale contract, Slay agreed to pay G & S one million dollars and to grant Sarnelli a leasehold interest in the property and to allow salvaging to occur at the site. (Plaintiffs' Exh. 105). Sarnelli testified that he had the right to salvage anything he wanted from the Site. (Sarnelli Depo. p. 18). Prior to entering into the lease agreement, Sarnelli and Ted Tahan discussed the condition in which Sarnelli was to leave the property at the conclusion of the salvaging operations, (Sarnelli Depo. p. 17), and everyone understood that Sarnelli was to leave the property in clean condition and, further, that he would be responsible for any

damage his operations caused to the property.

40. On May 29, 1979, after U.E. received approval for the sale from the ICC, both closings occurred, however, the transactions were distinct and independent. Slay did not participate in U.E.'s and G & S's closing. Similarly, U.E. did not participate in the G & S and Slay closing. Since U.E. was not a party to the Slay—G & S contract, it "was no business of U.E. what Slay wanted to do with the property." (Testimony of P. Simon). At no time did U.E. enter into a contractual relationship with Slay or Sarnelli. (Testimony of E. Slay, P. Simon; Sarnelli Depo. pp. 20–22; Plaintiffs Exh. 79). Further, Sarnelli was not U.E.'s agent, and U.E. had no authority to direct or control Sarnelli's activities. (Sarnelli Depo. pp. 21–22).

41. The realty was sold by quit-claim deed and the personal property and fixtures were sold "as is", expressly excluding warranties of "merchantable quality" or for "particular purpose". As noted, Slay understood this term to mean that the buyer took the property in whatever condition he found it with "the risk associated with fixing the equipment [to] be on the person purchasing the equipment." (E. Slay Depo. 3/30/92 p. 38).

42. On that same day, the lease between Sarnelli and the Slays was signed. Plaintiffs' Exh. 106. Slay left the negotiation of the sale contract and lease agreement up to his attorneys, Paul Simon and Ted Tahan. (Testimony of E. Slay). The Slay—G & S contract expressly contemplated and provided for salvaging activities to occur at the Site. Specifically, as an express condition to the contract, Sarnelli was granted access to the facility "for the purpose of removing and salvaging therefrom the Personal Property". The contract provided that "any inorganic debris may be dumped by Sarnelli at such locations on the property as Sarnelli and [Slay] may mutually agree", and that upon completion of Sarnelli's salvaging operations, Sarnelli was to "remove all debris ... and its materials and equipment." Further, the contract provided that Sarnelli "be responsible for any damage or deterioration caused by its salvage operations to the access roads and property." (Plaintiffs' Exh. 105). The only rent Sarnelli was to pay was one dollar per month. (Plaintiffs' Exh. 106).

43. Judge Simon testified that the lease agreement between Slay and Sarnelli was necessary because G & S owned the property and was conveying it to Slay; therefore, Sarnelli could not have access to the property without the lease. (Testimony of P. Simon). It was common knowledge to Simon that Sarnelli's operations would necessarily create debris. Accordingly, Simon sought to protect his client's interest by requiring the following:

(i) Lessee shall be responsible for any damage or deterioration to access roads and property caused by its salvage operations on the Cahokia Power Plant, and maintain the roads in good condition satisfactory to the Lessor;

(ii) Lessee's salvage operations shall not commence until Lessee has provided to Lessor's satisfaction liability insurance and a performance bond;

(iii) Lessee shall keep in operation the bilge pumps in the basement of the Leasehold Property;

(iv) Lessee shall remove the chimneys or smokestacks and repair the holes in the roof in a manner mutually acceptable to Lessor and Lessee;

(v) Lessee shall place the brick contained in said chimneys or smokestacks following this removal in areas of the plant designated by Lessor;

(vi) Lessee shall remove all debris and all of its materials and equipment—masonry debris to be dumped at such locations as Lessor designates;

(vii) Lessee shall be liable for any damage occasioned by or from plumbing, gas, water, sprinkler, steam, or other pipes or sewage or the bursting, leaking or running of any pipes.

(Plaintiffs' Exh. 106).

44. In Ted Jockenhoefer's July 13, 1979, report to Slay he advised Tahan as to various precautions that should be taken during Sar-

nelli's operations. Jockenhoefer cautioned against allowing Sarnelli to remove gutters, downspouts, leaders, flashings, etc. At Mr. Slay's request, Jockenhoefer supervised Sarnelli's operations to ensure that the salvage process was performed properly. Jockenhoefer confirmed that the items listed on the bid specification (attached as an exhibit to G & S—Slay's contract) were "attached to or congruent with the building structure." (Defendant's Exh. BX).

45. In mid-July of 1979, following Jockenhoefer's report, Sarnelli began his equipment removal activities. Prior to starting such activities, Sarnelli called Tahan and told him that he would be performing asbestos removal activities at the Site. (Sarnelli Depo. p. 24). Thereafter, on July 2, 1979 and in accordance with then applicable NESHAP (National Emission Standards For Hazardous Air Pollution) regulations, Sarnelli advised EPA that he was removing asbestos from the Site. Sarnelli simultaneously informed his bonding company and Slay that "[the] equipment will be stripped by hand of any and all asbestos covering after thorough wetting and any resulting asbestos will be placed in plastic bags and removed to an acceptable dump for disposal." (Plaintiffs' Exh. 108).

46. Based on the common knowledge in the industry that asbestos would be found in power plants of the Cahokia Site vintage, the Court finds that this knowledge certainly would have been known to Slay's agents, William Uhrig and Ted Jockenhoefer, if not also to others in his organization. Also, based upon the facts that U.E.'s bid specification clearly mentioned that asbestos likely would be found at the Site (Defendant's Exh. 16) and that Slay received notice from Sarnelli that he was about to begin removal of asbestos from the Site, the Court finds that Mr. Slay and others in his organization knew of the existence of asbestos at the Site at least by July 2, 1979.

47. Sarnelli performed the operations consistent with the common practice in the salvage industry in the 1979 to 1981 time frame. (Testimony of D. Schau).

48. Dismantling the boilers and turbines created large holes in the floors of the boiler room and turbine room. (Testimony of M. Schwartz). Debris created from the dismantling, including bricks, pipe, and asbestos insulation, was allowed to fall into the holes. (Testimony of M. Schwartz).

49. The buss-bars were removed by smashing asbestos transite tunnels and removing the bars. During the salvage of other valuable metals and equipment, asbestos was cut, torn, and stripped from equipment and thrown into compartments in the electrical bay area. (Testimony of M. Schwartz).

50. Sarnelli did salvage work on the roof of the building, leaving debris and other materials behind. Among the materials salvaged were motors and blowers. (Testimony of M. Schwartz).

51. When Sarnelli completed the dismantling and salvage work, the interior of the power plant, its roof, and the pumphouses were in shambles. The boiler room had been gutted. (Testimony of M. Schwartz and Hesse; Hesse photos numbered Plaintiffs' Exhs. 162A–L). Debris was on the floor. Pipes were cut and hanging. Windows and insulation were damaged. The lower levels of the building were filled with water on which oil and debris were floating. (Testimony of M. Schwartz).

52. Despite efforts by Slays to get Sarnelli to remove the debris, Sarnelli refused. A performance bond which had been taken out to insure Sarnelli's work was proper proved to be worthless. (Testimony of Eugene Slay).

53. In 1984, the Slay Companies engaged Mr. Marvin Schwartz to begin developing the Site into an intermodel facility where products could be transferred from one mode of transportation (i.e. barge, truck or railcar) to another. (Testimony of M. Schwartz). Plans included making the power plant into a warehouse and office facility. Mr. Schwartz acted as the manager of the property and was responsible for safety. (Testimony of M. Schwartz).

54. Before the power plant could be used as a warehouse, the massive amounts of debris remaining from the dismantling work had to be removed. (Testimony of M. Schwartz). Using bulldozers and shovels,

Slay employees put rubble into the holes Sarnelli's salvage operation had created in the boiler room and turbine room. Dangling asbestos-covered pipes which were in the way or created a safety hazard were cut down and pushed into the holes, which already had rubble in them from Sarnelli's work. Nothing was cleaned up or moved that had not already been cut or damaged by Sarnelli. Floors were then leveled, cemented over, and made ready for use. While this cleanup removed much debris left by Sarnelli, large amounts of damaged asbestos materials remained that were not in the way or did not constitute a safety hazard. Debris left on the roof from the Sarnelli operation was removed, and the entire roof was tarred in an unsuccessful attempt to eliminate roof leakage. (Testimony of M. Schwartz).

55. Marvin Schwartz was aware that insulation on the pipes and in the rubble might contain asbestos, based on his past experience as a sheet metal worker. (Testimony of M. Schwartz). However, although Schwartz was in charge of environmental compliance at the Cahokia Site, he was not aware of any regulatory requirements regarding asbestos removal and notification. Consequently, the plaintiffs never notified the EPA or IEPA regarding the renovation work. (Testimony of M. Schwartz). Thus, no precautions were taken to protect workers performing cleanup operations.

56. Plaintiffs dynamited and demolished the precipitator structure which was attached to the east side of power plant building and roof. (Testimony of M. Schwartz). Plaintiffs made no attempt to determine whether there was asbestos insulation on the precipitator structure prior to exploding the structure. (Testimony of M. Schwartz). Schwartz also dynamited through the walls of the lower level of the plant so as to provide access to the river for a conveyor system. After the blasting was completed, plaintiffs never repaired the damage resulting from such operations. (Testimony of M. Schwartz).

57. Plaintiffs' employees and experts all testified that plaintiffs have made no effort to maintain the asbestos in the plant. (Testimony of M. Schwartz, Glen Slay, Guy Slay, David Schau; J. Lueken Depo. p. 65–66; E.

Krzak Depo. p. 22; R. Modlin Depo. p. 29–30). Water would enter the plant through broken windows, leaks in the roof and the gaping holes resulting from the blasting operations and the insulation would get wet. When insulation gets wet, its rate of deterioration accelerates.

58. Development of the Site into an intermodel facility has been continuing since 1984. (Testimony of Glen Slay). Some transfer of materials took place on the Site even before the power plant salvage operation was done. Materials were stored in the aboveground storage tanks. The property was used for barge mooring. As cleanup of the power plant began in 1984, CMS also added various conveyors and unloading facilities. Only recently has the Site begun to handle enough materials to justify the expenses incurred in developing and cleaning up the property. (Testimony of Glen Slay).

59. In July of 1988, Coburn & Croft visited the Site for an initial inspection of environmental concerns. Coburn & Croft had Mr. David Schau, an industrial hygienist whose expertise involves asbestos, visit the Site shortly thereafter. (Plaintiffs' Exh. 148). Mr. Schau made a second visit to the Site in September of 1988. (Plaintiffs' Exh. 48). During his site visits, Mr. Schau took samples of material suspected to contain asbestos from the boiler room, pipes located in the yard and the pumphouses. Air monitoring for asbestos was also done.

60. Mr. Schau determined that much of the insulation materials in the boiler room, pumphouses, and the yard in fact contained asbestos. (Plaintiffs' Exh. 48).

61. As a result of his investigation and air samplings, Schau concluded that the conditions at the plant did not present a threat to employees under OSHA. Specifically, he found:

(1) Concentrations of asbestos reported during air sampling were all .003 fibers/lb and less (1,000 times below OSHA action levels).

(2) At levels below the action level, once the employer has documented exposures, no further action is necessary unless conditions change.

(3) Sampling results verified levels within a safe limit for workers.

(4) Air sampling results were below the generally acceptable level for building occupancy of .01.

(5) It is doubtful that the economic considerations warrant total removal of asbestos.

(Plaintiffs' Exh. 148).

62. Although the air monitoring results indicated that asbestos levels in the boiler room and by the pumphouses were below OSHA regulatory levels and industry standards, both NIOSH and OSHA agree that there is no safe level of exposure to asbestos. (Testimony of D. Schau). Further, Mr. Schau believed the air levels were low because of the significant amount of air flow through the power plants. (Plaintiffs' Exh. 148). Mr. Schau's opinion was that the asbestos located in the areas he sampled was extremely damaged as a result of a demolition operation. (Testimony of D. Schau).

63. In his report, Mr. Schau expressed concern that asbestos materials were continually falling from the pipes, duct work, and vessels within the boiler room and thereby contaminating the areas below. Also, Mr. Schau was concerned about asbestos materials falling in the grain stored in the power plant. (Plaintiffs' Exh. 148).

64. Based on his testing and review, Mr. Schau suggested that the pipes and materials in the yard and the pumphouses should be removed from the Site. (Plaintiffs' Exh. 148).

65. Mr. Schau recommended three potential actions regarding the boiler room. The asbestos could be removed, which would then alleviate all concerns regarding visible emissions of asbestos, but Mr. Schau acknowledged that such a removal action would be potentially time consuming and expensive. Alternatively, Mr. Schau suggested terminating use of the building for grain storage and limiting employee occupancy of the boiler room. Mr. Schau's final suggestion was to close down the building until remedial action could occur. (Plaintiff's Exh. 148).

66. Mr. Schau testified at trial that risks posed by the boiler room included: 1) being hit by falling debris; 2) getting asbestos on workers or visitors' clothes which could then be transported off site; and 3) asbestos exposure of workers handling contaminated grain. (Testimony of D. Schau).

67. Following the assessment by Mr. Schau, CMS terminated grain storage in the boiler room and limited employee occupancy. (Testimony of Glen Slay).

68. There is no evidence of asbestos contamination in the grain, river, or ambient air (both inside and outside). Schau never tested the Mississippi River, basement water or grain for asbestos. The one air sample taken outside the building indicated that there were no asbestos fibers above detection levels. Schau testified that in his opinion further outside testing was not necessary. Testing inside reflected that asbestos levels were all within acceptable regulatory guidelines. (Testimony of D. Schau).

69. No regulatory agency has cited plaintiffs, imposed special conditions or taken any enforcement action as to any alleged asbestos hazard at the property and, as noted, even plaintiffs' own counsel have concluded that there is no need to perform additional asbestos work from a regulatory point of view. (Plaintiffs' Exh. 110, pp. 17–18).

70. After receipt of Schau's reports, CMS then proceeded to obtain estimates for removal of the asbestos from the boiler room. (Testimony of K. Rhodes). The estimates ranged from $208,968.00 to over a million dollars. Because of the dangers posed by the deteriorated condition of the asbestos, CMS decided to go forward and remove the asbestos for the lowest bid amount of $208,968.00. This removal cost was close to the estimate given by one company for managing the asbestos in place by encapsulation and cleaning. (Plaintiffs' Exh. 113).

71. CMS awarded the asbestos removal work to the lowest bidder, FCA Services, Inc. (Testimony of K. Rhodes). FCA sent notice to the state of Illinois that it planned to remove asbestos at the Site. The removal work began on October 23, 1989 and finished on March 29, 1990. (Plaintiffs' Exh. 163). For the entire five months, the boiler room was completely shut down and enclosed in

order to prevent emissions to the rest of the Site. (Testimony of Rhodes). The final cost of FCA's removal was $189,909.38. (Plaintiffs' Exh. 13).

72. Pipes in the yard were removed by FCA during its asbestos removal in the boiler room. (Gene Krzak Depo., pp. 21–22; 33–34).

73. The condition of the asbestos in the pumphouses was deteriorated and friable as of Dave Schau's visit in 1988. The windows and doors on the pumphouse were gone. (Testimony of D. Schau). Mr. Schau also testified that asbestos could have gotten out of the pumphouses and exposed people or the river. Thus, Mr. Schau recommended removal of the asbestos.

74. CMS received several bids for removal of the asbestos from the pumphouse. FCA submitted a bid on May 25, 1990 for $36,848.00. (Plaintiffs' Exh. 113, pg. A00199). Ultimately, CMS chose the lowest bid of $7,400.00 and had the asbestos removed by Environmental Rehab in 1991. (Plaintiffs' Exh. 114). Prior to its removal, Environmental Rehab sent notice to the state of Illinois of its plan to remove asbestos from the Site.

75. The cost of the work completed by FCA Services, from October 23, 1989, until March 29, 1990, in removing the asbestos from the boiler room and the turbine room section of the building is being sought as part of the plaintiffs' damages in this case. However, the Court finds that the pump house was demolished so plaintiffs could construct a boiler room for a steam boiler and not for any environmental clean-up concern. (J. Paris Depo. pp. 46–47) (Guy Slay Depo. p. 62). Also, Environmental Rehab failed to comply with IEPA's Notification of Demolition and Renovation requirements. (Defendant's Exhs. ES, ET).

76. FCA submitted a proposal to remove asbestos from the roof of the power plant building, as well as possible asbestos containing floor tile, tile mastic, pipe insulation and transite boards from the electrical bay area of the building. Plaintiffs seek a declaration as to U.E.'s liability as to those not yet incurred costs.

77. The Court finds that all of the asbestos removal done to date and all that has been proposed are the voluntary acts of the Slay organization for their own business reasons in enhancing their use of the property.

78. As to what issues remain regarding PCB's, the plaintiffs' search for PCBs at the Site has been exhaustive. While four transformers (two on the roof and two on poles inside the building) containing PCBs have been found, U.E. has taken complete responsibility for them by seeing they were promptly and properly removed and disposed of. There is no evidence that these transformers leaked or of any residual contamination. Nevertheless, plaintiffs' quest for finding residual PCB contamination continued. Plaintiffs' expert Bob Johnson testified that from 1988 through 1992 he sampled Mississippi river water, basement water, transformer substation capacitors, electrical equipment, drums of oil, sump pump sediment, transformers and various other electrical equipment, looking for PCBs. When the initial tests came back negative, the plaintiffs were not satisfied, and they sent samples to California to be sampled by a supposedly more sophisticated lab. All of the test results, from whatever source and however analyzed, indicated levels well below regulatory concern. (Plaintiffs' Exhs. 52, 118, 119, 132, 143) (Testimony of R. Johnson, W. Shifrin). Plaintiffs' counsel came to the same conclusion in their Environmental Assessment which concluded that "No PCB contamination of regulatory significance has been found inside the building to date." (Plaintiffs' Exh. 110, p. 3).

79. There are four partially underground tanks located at the Site. They were the subject of Count V of plaintiffs' Third Amended Complaint—the RCRA Citizens' Suit Count—which this Court has already dismissed. To the extent they remain in the case for plaintiffs' remaining counts, the Court finds that the tanks are either empty or contain very small residual amounts of petroleum products. Petroleum products are excluded from CERCLA. (Defendants Exh. HY) (Testimony of R. Johnson, W. Shifrin). Further, there is no evidence of contamination in the area around the underground

tanks. (Testimony of R. Johnson, W. Shifrin).

80. Based on the testimony adduced, the Court finds that neither the PCB contamination, the oils in the transformers and other electrical equipment, the underground storage tanks, nor any other conditions at the Site present a threat of risk to public health or the environment to require their remediation pursuant to CERCLA.

81. The Court finds that the plaintiffs did not present sufficient evidence to support a finding that the conditions at the Site present an actual threat to public health or the environment. The costs associated with testing transformers, drums, electrical equipment and underground storage tanks were not necessary to address any threat at the Cahokia Site. In fact, such testing merely confirms that no such threat exists. Also, the costs associated with Schau's industrial hygiene survey were not caused by releases or threatened releases of hazardous substances. In fact, as noted above, Schau concluded that there are no releases or regulatory concern at the Site. Schau's report was part of plaintiffs' overall corporate plan to evaluate its properties and was not taken in response to an actual threat to public health or the environment.

82. The following are costs that the plaintiff asserts are response costs for which recovery is sought: $189,909.38 for FCA to perform the removal from the boiler room (Plaintiffs' Exh. 163); $7,400.00 for Environmental Rehab's removal of asbestos from the pumphouse (Plaintiffs' Exh. 115); $1,221.25 for Dave Schau's 1988 inspection and report; another $863.00 was spent for Mr. Schau's 1992 services (Plaintiffs' Exh. 152); various samplings were performed to obtain answers on possible hazardous substances at the Site for a total costs of (found in Plaintiffs' Exhibits 144, 145, 146, 160, and 204) $32,668.80.

83. Plaintiffs presented no evidence that they even considered, much less complied with, the requirements of the NCP prior to undertaking the asbestos abatement actions.

84. Plaintiffs' Environmental Assessment was performed after FCA's abatement action and therefore does not constitute a Preliminary Assessment under the NCP. Plaintiffs presented no evidence that the NCP was considered or followed in drafting or performing the Environmental Assessment. Furthermore, that document makes no reference to the NCP or its requirements. Also, the NCP was not considered when Schau, FCA, or Environmental Rehab performed asbestos-related work. (Testimony of D. Schau, R. Modlin, E. Krzak). In short, plaintiffs presented no evidence that it complied with any requirement of the NCP.

85. Renovation projects involving asbestos are commonplace. A detailed regulatory scheme has been developed to assure that these projects are undertaken safely. (Defendant's Exhs. HG, DM). Plaintiffs' expert and removal contractor testified that he does this work everyday and he agrees it can be done safely. (Depo. E. Krzak p. 17–18). Defendant's expert agrees. (Testimony of W. Shifrin).

86. Defendant's real estate expert Ted Martin, Chairman of the Board of the Turley Martin Company, testified by deposition that he visited the Site on behalf of several companies who were interested in bidding on the plant. Mr. Martin testified that the sale of industrial property in 1979 was a common occurrence and that many of these sales involved industrial properties containing asbestos. (Depo. T. Martin 20–21, 29–33). Certainly, a building with the characteristics of the Cahokia plant was appropriately located in Sauget, Illinois, a predominately industrial community. Moreover, owning, selling, and buying a building that has asbestos and some equipment with flammable materials does not itself create an abnormally dangerous activity. (Testimony of D. Schau; Testimony of R. Johnson; Testimony of W. Shifrin). Furthermore, so long as regulatory guidelines were followed, asbestos removal projects can be performed safely and without undue risk now and in 1979. (Testimony of D. Schau). (Testimony of W. Shifrin).

87. Defendant's expert Walter Shifrin testified to each of the six factors on ultrahazardous activity set forth in the Restatement (Second) of Torts, § 520. (Defendant's Exh. HZ). After analyzing each factor in detail, he offered his opinion that U.E.'s sale

of a property containing asbestos, trace PCB residuals and alleged flammable fluids was not an ultrahazardous activity. The Court concurs with his opinion that U.E. did not engage in an ultrahazardous activity as a matter of law.

## II. Conclusions of Law

*THE CERCLA CLAIM*

■ 1. To impose cleanup liability under CERCLA, a plaintiff must prove four elements:

(1) The site in question is a "facility" as defined by § 9601(9);

(2) The defendant is a "responsible person" under § 9607(a);

(3) There was a release or threat of release of hazardous substances; and

(4) That such release caused the plaintiff to incur necessary costs consistent with the NCP.

42 U.S.C. § 9607(a). *See Kerr–McGee Chemical Corp. v. Lefton Iron & Metal,* 14 F.3d 321 (7th Cir.1994). In a private CERCLA action, the plaintiff bears the burden of establishing that each of the *prima facie* elements exist. *See Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146, 1150 (1st Cir.1989); *Channel Master Satellite Systems, Inc. v. JFD Elec. Corp.,* 748 F.Supp. 373, 381 (E.D.N.C.1990).

■ 2. CERCLA only governs materials defined as "hazardous substances" under CERCLA. *See* 42 U.S.C. § 9601(14). Asbestos is such a hazardous substance. 40 C.F.R. § 302.4; *see also National R.R. Passenger Corp. v. NYC Housing Auth.,* 819 F.Supp. 1271 (S.D.N.Y.1993). However, CERCLA specifically excludes petroleum and petroleum byproducts from the definition of "hazardous substances." 42 U.S.C. § 9601(14).

### 1. Plaintiff's Asbestos Removal is Not Included Under CERCLA.

3. This Court has previously recognized that there is no dispute that the Site in question is a facility as defined by § 9601(9). *G.J. Leasing Co. v. Union Electric Co.,* 825 F.Supp. 1363 (S.D.Ill.1993). However, courts have held that CERCLA does not apply to asbestos that is incorporated into walls and ceilings of buildings because of the "consumer product in consumer use" exemption for facilities in 42 U.S.C. § 9601(9). *See Amcast Industrial Corp. v. Detrex Corp.,* 2 F.3d 746, 750 (7th Cir.1993) (citing *Dayton Independent School District v. U.S. Mineral Products Co.,* 906 F.2d 1059, 1065–66 (5th Cir. 1990)).

■ 4. CERCLA contains a significant limitation on the scope of the law and EPA's response authority:

(3) *Limitations on Response.*

The President shall not provide for removal or remedial action under this section in response to a release or threatened release

. . .

(B) *from products which are part of the structure of, and result in exposure within, residential buildings or business or community structures.*

42 U.S.C. § 9604(a)(3)(B). Also, CERCLA's definition of "release" excludes any release which results in exposure to persons solely within a workplace. 42 U.S.C. § 9601(22). These jurisdictional limitations apply to private parties responding to such releases. *Retirement Community Developers, Inc. v. Merine,* 713 F.Supp. 153, 155–6 (D.Md.1989).

5. Based on these provisions, courts have concluded that asbestos contaminants resulting from products which are part of the structure of residential or commercial buildings are beyond the purview of CERCLA. *See Anthony v. Arthur Blech,* 760 F.Supp. 832, 836 (C.D.Cal.1991) (Congress' intent to exclude asbestos removal from CERCLA actions extends to asbestos dust emanating from fire damaged materials which were part of a building's structure), *aff'd, People of State of Cal. v. Blech,* 976 F.2d 525 (9th Cir.1992). *See also 3550 Stevens Creek Associates v. Barclays Bank of California,* 915 F.2d 1355 (9th Cir.1990) (holding there is no private right to relief for removal of asbestos from a commercial building); *Dayton Indep. School Dist. v. United States Mineral Products,* 906 F.2d 1059 (5th Cir.1990) (asbestos-containing building products are exempt as consumer products, and are not "disposed" of within the meaning of CERCLA); *First*

*United Methodist Church of Hyattsville v. United States Gypsum,* 882 F.2d 862, 867 (4th Cir.1989) (CERCLA is not intended to apply to abatement costs associated with removal of asbestos installed as part of building structure); *See generally Covalt v. Carey Canada, Inc.,* 860 F.2d 1434, 1437 (7th Cir. 1988) (asbestos encountered at work is not a toxic waste, and the Superfund Act is about inactive hazardous waste sites; suit against asbestos manufacturer based on work place exposure was dismissed).

■ 6. The removal of asbestos or building materials from a commercial building, such as the case here, is not redressable under CERCLA. In *3550 Stevens Creek Associates v. Barclays Bank of California,* 915 F.2d 1355 (9th Cir.1990), the purchaser of a commercial building who, as here, voluntarily removed asbestos during a remodeling of the building sued the former owner under 42 U.S.C. § 9607(a)(2) of CERCLA for the recovery of those abatement costs. The Ninth Circuit Court of Appeals ruled that CERCLA does not permit such an action. The Court noted:

> [T]here is no authority recognizing a private right to relief for the voluntary removal of asbestos from a commercial building. The cases upon which Stevens Creek and the EPA rely concern the disposal or dumping of hazardous substances as waste, and not the removal of asbestos from a commercial building. Even those cases which do involve asbestos relate to its disposal as waste rather than its use as a building material, and no federal court which has considered the placement of asbestos as part of the·structure of a building has concluded that it falls within the scope of Section 107(a).

915 F.2d at 1359.

■ 7. Accordingly, CERCLA does not provide a private right of action to recover the cost of removing from a building asbestos which is part of the structure.

■ 8. It is uncontested that the asbestos at issue was part of the structure of the building at the time the property was sold. Every witness who testified to this point agreed. The fact that the asbestos insulation was attached to pipes, ductwork, pieces of equipment, etc. does not change this result because in each instance those items were attached to and were a integral part of the building structure. As described by Slay's engineering consultant, all of the equipment was "attached to or congruent with the building structure." (Defendant's Exh. BX). Therefore, the Court finds that CERCLA in not applicable to the abatement of asbestos performed at the Site.

## 2. U.E. Is Not A Responsible Party Under CERCLA.

9. CERCLA 107(a) defines "responsible party" as:

> (1) the owner and operator of a vessel or a facility;
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of;
>
> (3) any person who arranged for disposal or treatment of hazardous substances at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances; and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person.

*See* 42 U.S.C. § 9607(a).

■ 10. As the present owner and/or operator of the Site, plaintiffs are responsible parties under Section 107(a)(1). *See* 42 U.S.C. § 9607(a); *Amcast Industrial Corp. v. Detrex Corp.,* 2 F.3d 746, 750 (7th Cir. 1993). Also, as the owner of the Site at the time Sarnelli conducted its salvaging operations and when Schwartz did his remodeling work, plaintiffs are responsible parties under Section 107(a)(2). Moreover, by entering into a lease agreement with Sarnelli for salvaging to occur at the Site, Slay, or one of his corporate entities, arranged for the disposal of hazardous substances and is a responsible party under § 107(a)(3).

11. Plaintiffs' principal argument is that U.E. is a responsible party under Section 107(a)(3) because it "arranged for the disposal" of asbestos and other allegedly hazardous substances because U.E. knew that G & S intended to remove equipment from the power plant building and that the building could not be used by a subsequent purchaser without renovation.

12. U.E. argues that while it believed the Site probably would not be used for its initial purpose of generating electricity, the Site nevertheless possessed tremendous commercial value and could be used for a variety of purposes. Also, the power plant equipment was both valuable and operable and could be sold for resale. U.E. further contends that if any "emitting into the air" of asbestos took place, such "disposal" occurred during Slay's ownership and pursuant to the terms of a contractual relationship between Sarnelli and Slay. According to U.E., under such circumstances the sale of the power plant property was not an "arrangement for disposal" within the meaning of CERCLA. Thus, resolution of this issue involves consideration of the meaning of the terms "disposal" and "arranged for."

13. CERCLA adopts the Solid Waste Disposal Act's definition of "disposal," which defines disposal as:

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous substance into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters. [42 U.S.C. § 6903(3)]

42 U.S.C. § 9601(29). "Disposal" requires an affirmative act and takes place "only at the point at which there is a threat that hazardous wastes will be emitted into the environment." *AM International Inc. v. International Forging Equipment Corporation,* 982 F.2d 989, 998 (6th Cir.1993); *3550 Stevens Creek,* 915 F.2d at 1362; *Prudential Ins. Co. of America v. United States Gypsum,* 711 F.Supp. 1244, 1253–56 (D.N.J.1989) (sale of asbestos building material is not "disposal" of asbestos under CERCLA). *See also United*

*States v. Petersen Sand and Gravel,* 806 F.Supp. 1346, 1350–1353 (N.D.Ill.1992) ("passive disposal" does not form the basis for CERCLA liability).

14. Similarly, the phrase "arranged for" implies intentional action. In the case of *Amcast Industrial Corp. v. Detrex Corp.,* 2 F.3d 746 (7th Cir.1993), the Seventh Circuit, in analyzing the terms "arrange for" and "disposal" stated:

In the context of the operator of a hazardous-waste dump, "disposal" includes accidental spillage, in the context of the shipper who is arranging for the transportation of a product, "disposal" excludes accidental spillage because you do not arrange for an accident . . .

\* \* \* \* \* \*

But when the shipper is not trying to arrange for the disposal of hazardous wastes, but is arranging for the delivery of a useful product, he is not a responsible person within the meaning of the statute . . .

*Amcast,* 2 F.3d at 751. Liability can only be imposed on the person who makes the crucial decisions as to how, where and when to dispose of a hazardous substance. *See e.g., United States v. A & F Materials Company,* 582 F.Supp. 842, 845 (S.D.Ill.1984).

15. Here, the "threat that hazardous substances would be emitted into the environment" occurred after G & S sold the property to Slay who then leased the facility to Sarnelli, who then salvaged equipment from the power plant building. U.E.'s sale of the Cahokia Power Plant and surrounding acreage does not fall within the "discharge, deposit, injection, dumping, spilling or leaking" definition of "disposal."

16. The mere sale of property containing hazardous substances is insufficient to impose arranger liability on the seller. *Jersey City Redevelopment Authority v. PPG Industries,* 655 F.Supp. 1257, 1260 (D.N.J.1987). *See also Kelley v. ARCO Indus. Corp.,* 739 F.Supp. 354, 357–58 (W.D.Mich.1990); *Florida Power & Light Co. v. Allis Chalmers Corp.,* 893 F.2d 1313, 1317 (11th Cir.1990) ("if a party merely sells a

product, without additional evidence that the transaction included an "arrangement" for the ultimate disposal of a hazardous substance, [the sale] does not create CERCLA liability"). Where the seller is not primarily motivated to "dispose" of hazardous substances, courts have declined to impose liability. *See, e.g., Edward Hines Lumber Co. v. Vulcan Materials,* 685 F.Supp. 651, 656 (N.D.Ill.), *aff'd,* 861 F.2d 155 (7th Cir.1988) (where there was evidence that chemical substances were sold for manufacturing purposes, court determined that the sale was not motivated by an intent to dispose of hazardous substances under § 9607(a)(3)). *See also C. Greene Equipment Corp. v. Electron Corp.,* 697 F.Supp. 983, 986–87 (N.D.Ill.1988) (the stated reason for the sale, the purchase price and the condition of the property are relevant in determining a seller's motive).

17. The sale of a useful product even though the product contains a hazardous substance, does not constitute a "disposal" subjecting the seller to CERCLA liability. *United States v. Wedzeb Enterprises Inc.,* 809 F.Supp. 646, 656–657 (S.D.Ind. 1992). *See also Ashland Oil, Inc. v. Sonford Products Corp.,* 810 F.Supp. 1057, 1061 (D.Minn.1993) (sale of contaminated property of debtor to creditor does not constitute "arrangement for disposal"); *AM International Inc. v. International Forging Equipment Corporation,* 743 F.Supp. 525 (N.D.Ohio 1990), *aff'd in part, rev'd in part,* 982 F.2d 989 (6th Cir.1993). Moreover, even if the "product" is not used for the purpose originally intended but can be used for some collateral purpose, liability will not be imposed absent some other evidence such as the retention of an ownership interest in the product. *See Catellus Development Corp. v. United States,* 828 F.Supp. 764, 768–72 (N.D.Cal.1993) (the sale of batteries for salvage did not constitute an arrangement for disposal).

18. There is absolutely no evidence that U.E. intended to dispose of hazardous substances by selling the Cahokia Power Plant. Every single U.E. witness, whether called by plaintiffs or defendant, credibly testified that U.E. was motivated by economic considerations relating to the cost of producing power

at the plant and that the presence of asbestos or other alleged hazardous substances was not a factor at all in the decision either to decommission or sell the plant. U.E. believed that the property and attached equipment had commercial value and use in the commercial resale market. Indeed, the evidence established that U.E. was correct in its view that the property, building and attached equipment had commercial value.

19. There have been a very few cases where liability under 42 U.S.C. § 9607(a)(3) has been imposed because the sale was found to be simply a sham for disposal. *See, e.g., Sanford Street Local Dev. Corp. v. Textron, Inc.,* 768 F.Supp. 1218, 1222 (W.D.Mich.1991) (sale of manufacturing facility including hazardous substances at an amount vastly below appraised value may constitute a "disposal" of the substances). Here, however, there is no evidence that the sale of the power plant property was a "sham". The purchase price was established through competitive bidding. The entire property had value including the equipment which was capable of reuse. U.E.'s purchaser testified that the purchase price was fair and reasonable and specifically contemplated the cost of asbestos removal. Mr. Slay testified that he never intended to demolish or tear down the power plant building and that he wanted the power plant equipment removed. Slay's "injury" occurred as a result of his failure to monitor and control the actions of his tenant, his failure to monitor his own employee, Marvin Schwartz, and his failure to maintain the Site in proper repair. They were not as a result of U.E.'s decision to sell the Cahokia Power Plant to G & S.

20. Traditional notions of duty and obligations are to be imposed in deciding whether an entity is liable under CERCLA for the disposal of hazardous substances. *General Electric Company v. Aamco Transmissions, Inc.,* 962 F.2d 281, 286 (2d Cir. 1992) (it is the obligation to exercise control over hazardous waste disposal and not the mere ability or opportunity to control the disposal of hazardous substances that makes an entity an arranger under CERCLA). Once U.E. sold the property to G & S, U.E.'s ownership interest terminated. Sarnelli, in-

dependent of U.E.'s control or influence, allegedly failed to comply with NESHAP regulations governing the proper removal and disposal of asbestos, as did Slay's employee, Schwartz. Slay, as the owner of the Site at the time asbestos was removed, had the obligation to control the conduct of his tenant and employee. As Slay's former attorney Paul Simon noted, U.E. had no legal right to direct, supervise, or control the actions of Slay or his tenant.

21. Accordingly, the Court finds that U.E.'s sale of the Site to G & S under the circumstances described herein was not a "sham" and did not constitute an "arrangement for disposal" under 42 U.S.C. § 9607(a)(3) of CERCLA. Thus, U.E. is not a covered party under CERCLA and cannot be liable.

### 3. There was a "threat of a release" at the Site.

■ 22. Lifting the language from this Court's July 9, 1993, Order in this cause, this Court concludes:

Courts have held that a broad reading should be given to the terms "release" and "threat of release." *See Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784 (D.N.J.1989). This Court agrees. Therefore, the Court finds that as to asbestos it does appear that at least a threat of a release exists at the site. The defendant's argument that the environmental tests show that there has not been a release of the substances sufficient so as to register on this test has no bearing on whether a "threat of a release" is present. Also, the defendant has cited no cases indicating that in order to show a threat of release, the plaintiffs must first follow all regulatory requirements. From the facts set forth by the plaintiffs, it appears clear that there is a "threat of release" of asbestos on this site.

*G.J. Leasing Co. v. Union Electric,* 825 F.Supp. 1363, 1378.

■ 23. The plaintiffs assert that the flood of 1978 and U.E.'s response thereto caused a release at the Site. This Court finds, however, that this determination is unnecessary in this particular cause of action.

The plaintiffs have presented this Court with no evidence of any costs they have incurred in response to this alleged "release" that occurred in 1978, prior to G & S's or Slay's ownership of the facility.

■ 24. Two elements are necessary under *Amland* for there to be a threat of a release of PCBs in an area: the presence of the hazardous substances *plus* the unwillingness of a party to assert control over the substances. Since in this case, all of the evidence presented indicates that U.E. properly disposed of the only PCBs found at the Site, this Court concludes that there has been no "release" or "threat of release" of PCBs at the Site.

### 4. Plaintiffs' Alleged Response Costs Were Not "Necessary" Under CERCLA.

■ 25. CERCLA § 107 provides only for the recovery of the following defined response costs by private parties:

(B) any other *necessary* costs incurred by any other person consistent with the National Contingency Plan.

42 U.S.C. § 9607(a)(4) (emphasis added). Congress did not intend CERCLA to make injured parties whole or to create a general vehicle for tort actions. *Versatile Metals, Inc. v. Union Corp.,* 693 F.Supp. 1563, 1582–83 (E.D.Pa.1988), citing *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. 1269, 1299–1300 (D.Del.1987). Accordingly, the expenses that may be recovered under CERCLA are limited in private party cost recovery actions to those which are identified and defined as "necessary costs of response ... consistent with the National Contingency Plan." 42 U.S.C. § 9607(a)(4)(B); *Versatile Metals Inc.,* 693 F.Supp. at 1582–1582; *Ambrogi v. Gould, Inc.,* 750 F.Supp. 1233, 1238–1239 (M.D.Pa. 1991). A private party must prove affirmatively that its response costs were both necessary and consistent with the NCP in order to recover under CERCLA. *County Line Investment Co. v. Tinney,* 933 F.2d 1508, 1512 (10th Cir.1991).

■ 26. In order to show that any response costs were necessary under CERC-

LA, plaintiffs must demonstrate they responded to a threat to public health or the environment. *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 669–670 (5th Cir.1989); *Louisiana–Pac. Corp. v. ASARCO, Inc.,* 735 F.Supp. 358, 362 (W.D.Wa.1990). A theoretical threat is not enough. For response costs to be "necessary", plaintiffs must establish that an actual and real public health threat exists prior to initiating a response action. *See e.g., Matter of Bell Petroleum Services, Inc.,* 3 F.3d 889, 904–906 (5th Cir.1993). To show that costs incurred were "necessary" under CERCLA, a party must show (1) that the costs were incurred *in response to* a threat to human health or the environment, and (2) that the costs were necessary to address that threat. *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. 1269, 1278 (D.Del.1987). *BCW Assoc., Ltd. v. Occidental Chem. Corp.,* 1988 WL 102641, 1988 U.S.Dist. LEXIS 11275 (E.D.Pa.1988) Also, CERCLA liability attaches only where a release or threatened release of a hazardous substance "causes the incurrence of response costs." 42 U.S.C. § 9607(a)(4); *Dedham Water Co., v. Cumberland Farms Dairy, Inc.,* 972 F.2d 453, 459 (1st Cir.1992). In this case the evidence established that plaintiffs had other business reasons for undertaking site investigations and abatement actions. To the extent that these actions were taken for purposes other than responding to an actual and real public health threat, there is no CERCLA liability.

27. Plaintiffs contend that removal of the asbestos from the power plant building was necessary: (a) due to the potential contamination of grain stored in the building; (b) due to the potential contamination of water in the Mississippi River; and (c) to protect against employee exposure. Plaintiffs have not demonstrated that there are any actual or potential risks posed by conditions at the Site. Plaintiffs presented no evidence of grain or water contamination which threatened public health. Plaintiffs have not analyzed the grain or river water or investigated to determine whether an actual public health threat exists from those sources.

28. Employee exposure to asbestos is not the type of "threat" redressable under CERCLA. "OSHA is more properly viewed as an employee protection law rather than an environmental law"... and thus "do[es] not come within the scope of ARARS [applicable or relevant and appropriate requirements] under CERCLA." 55 Fed.Reg. 8679–8680 (March 8, 1990). Furthermore, all asbestos exposure levels within the power plant building are well below OSHA action levels. Accordingly, plaintiffs' voluntary removal of asbestos, while perhaps desirable to improve employee working conditions and to allow plaintiffs better utilization of the Site, was not "necessary" as the term is defined by CERCLA and, therefore, is not recoverable.

29. Plaintiffs also seek recovery for PCB sampling and investigation costs. Such costs are irrelevant because there is no evidence of a release of PCBs which has caused plaintiffs to incur response costs. *See Ambrogi,* 750 F.Supp. at 1250 (expenses incurred for air, water, and soil testing and monitoring can be recoverable only if they were necessary expenses incurred consistent with NCP). "The response contemplated by the NCP is triggered by information concerning a *specific* release" ... and does not "broaden into an investigation designed to unearth *every* pollutant present on the property." *HRW Systems Inc. v. Washington Gas Light Co.,* 823 F.Supp. 318, 343 (D.Md.1993). This Court finds that the plaintiffs' exhaustive search for PCBs was not necessary or in response to a release of a hazardous substance.

30. Plaintiffs argue that removal of asbestos was necessary to "bring the facility into NESHAP compliance." In so arguing, plaintiffs misconstrue the scope of NESHAP's requirements. As the EPA recently made clear, there is no legal or regulatory requirement to remove asbestos from a facility:

The presence or absence of ACM [asbestos containing material] in a facility does not trigger any requirement under Asbestos NESHAP regarding whether or not an owner and/or operator need to demolish a building or whether or not an owner and/or operator needs to remove materials that will not be disturbed during a renovation. Rather, the Asbestos NESHAP mandates work practice and notification requirements when threshold amounts of RACM

[regulated asbestos containing material] are stripped, removed, dislodged, cut, drilled or similarly disturbed as a result of a building owner's independent decision to initiate renovation or demolition activities . . . .

58 Fed.Reg. 51784 (Oct. 5, 1993) (Defendants Exh. HG).

31. As the above regulation makes clear, since there is no regulatory requirement to remove asbestos from the power plant, plaintiffs decision to remove asbestos was not justified or "necessary" within the meaning of CERCLA. Accordingly, plaintiffs' decision to remove asbestos from the power plant and pump house buildings were not proper response costs under CERCLA. *Ambrogi,* 750 F.Supp. at 1250 (economic losses such as claims of "loss of beneficial use" are not recoverable under CERCLA); *citing Versatile Metals, Inc. v. The Union Corp.,* 693 F.Supp. at 1582–83. *See also Rhodes v. County of Darlington, S.C.,* 833 F.Supp. 1163, 1180 (D.S.C.1992) (property damage is not "response cost" as contemplated by CERCLA).

32. Based on the foregoing analysis, the Court concludes that none of plaintiffs' costs, either expended to date or proposed to be spent in the future, are "necessary" costs of response as that term is intended under CERCLA.

33. The evidence established that the underground storage tanks and electrical equipment contain petroleum byproducts that are not "hazardous" within the meaning of CERCLA. Since the underground tanks and equipment are nonleaking and do not contain hazardous substances as defined by CERCLA, plaintiffs' testing and analysis costs were not expended in response to a release of a hazardous substance and, therefore, are not recoverable. Further, the Court finds that much of the analytical work performed by Mr. Johnson and Global Geochemistry simply confirmed that the equipment did not contain PCBs, a fact already known to plaintiffs.

**5. Plaintiffs Have Failed to Comply With the National Contingency Plan.**

34. In addition to being "necessary", response costs must be incurred "consistent with the National Contingency Plan" ("NCP") if the plaintiffs are to prevail. The NCP is a federal regulation designed to assure that a CERCLA quality cleanup is achieved if the strict liability provisions of CERCLA are going to be used to impose liability on another party. 42 U.S.C. § 9607(a) (Testimony of W. Shifrin).

35. Private parties are statutorily required to work within the ambit of the NCP in recouping any response costs. *Ambrogi v. Gould,* 750 F.Supp. at 1238. A plaintiff has the burden of demonstrating that the costs it seeks to recover were incurred consistent with the NCP. *See e.g., United States v. Northeastern Pharmaceutical & Chem. Co.,* 810 F.2d 726, 747 (8th Cir.1986); *Amland Prop. Corp. v. Alcoa,* 711 F.Supp. 784, 795 (D.N.J.1989). Further, a response cost is recoverable under CERCLA only if it is consistent with the NCP in effect at the time the response costs were incurred. *See e.g., City of Philadelphia v. Stepan Chem. Co.,* 748 F.Supp. 283, 290 (E.D.Pa. 1990); *Versatile Metals, Inc.,* 693 F.Supp. at 1575.

36. The 1985 NCP applies to plaintiffs'. costs for asbestos abatement activities performed in the power plant building as well as the majority of plaintiffs' sampling and investigative costs. *See Tri–County Business Campus Joint Venture v. Clow Corp.,* 792 F.Supp. 984, 990 (E.D.Pa.1992) (cleanup must be underway on April 9, 1990 for 1990 NCP to apply); *Artesian Water Co.,* 659 F.Supp. at 1293–94. The standard for compliance under the 1985 NCP is strict. *County Line Inv. Co. v. Tinney,* 933 F.2d 1508, 1513–15 (10th Cir.1991); *U.S. Steel Supply Inc. v. Alco Standard Corp.,* 1992 WESTLAW 229252 (N.D.Ill. Sept. 9, 1992), citing *Amcast Industrial Corp. v. Detrex,* 779 F.Supp. 1519, 1536 (N.D.Ind.1991).

37. The 1990 NCP applies to costs incurred after April 9, 1990. *Con–Tech Sales Defined Benefit Trust v. Cockerham,* 1991 WESTLAW 209791 (E.D.Pa.1991). Under

564

the 1990 NCP, a response action will be considered consistent with the NCP "if the action when taken as a whole, is in substantial compliance with the applicable requirements and results in a CERCLA-quality cleanup." The 1990 NCP applies to the removal of asbestos from the pumphouse.

■ 38. Under either the 1985 or the 1990 statutes, the plaintiffs have failed to comply with the requirements of the NCP. In fact, at trial plaintiffs presented no evidence that plaintiffs ever considered, much less complied with, the NCP prior to initiating any of the environmental work associated with the property.

■ 39. All response costs, except for monitoring and investigatory costs, which the plaintiffs have incurred are "remedial costs" (versus "removal costs"). A removal action involves the immediate response to an emergency situation, while a remedial action is a permanent solution and prevents future releases. *U.S. Steel Supply, Inc. v. Alco Standard Corp.*, 1992 WL 229252 (N.D.Ill., Sept. 9, 1992).

40. Plaintiffs' actions do not qualify as a removal, because plaintiffs have identified no "immediate threat" that would justify a removal action. *Channel Master*, 748 F.Supp. at 385. Both plaintiffs' and defendant's experts testified that the conditions at the Site do not pose an emergency or an immediate threat. In fact, plaintiffs have been in sole possession of the Site since 1982 and were well aware of the condition in which Sarnelli left the property and yet took no action until the late 1980's.

41. While plaintiffs' actions to date do not qualify as a CERCLA "removal," even if they did, they did not comply with the NCP. For removal actions, a private party must first conduct a "removal site evaluation," including a "preliminary assessment" to determine if a removal action is appropriate. 40 C.F.R. § 300.410(b) (1990); 40 C.F.R. § 300.-64(a) (1986). Under the NCP, the removal "preliminary assessment" includes a determination of whether there is any "threat to public health" as well as an "evaluation of the magnitude of the threat." 40 C.F.R. § 300.-410(c)(ii) and (iii) (1990); 40 C.F.R. § 300.-

64(a)(2) and (3) (1986). If "the release involves neither a hazardous substance, nor a pollutant or contaminant that may present an imminent and substantial danger to public health or welfare," then the removal action must be terminated. 40 C.F.R. § 300.-410(e)(3) (1990); *see also,* 40 C.F.R. § 300.-64(c) (1986).

42. The 1985 NCP lists seven factors which "shall be considered in determining the appropriateness of a removal action." 40 C.F.R. § 300.65(b)(2). These factors "are used to identify the extent and immediacy of the threat of public health, and are an essential step in determining the appropriateness of undertaking a cleanup prior to the more detailed study required in a remedial action." *Channel Master Satellite Sys. Inc.*, 748 F.Supp. at 391. The seven factors are:

(1) the actual or potential exposure to hazardous substances to nearby properties, animals, or food chains;

(2) actual or potential contamination of drinking water supplies or sensitive ecosystems;

(3) hazardous substances in drums, tanks, or other bulk storage containers that may pose a threat of release;

(4) high levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface that might migrate;

(5) weather conditions;

(6) threat of fire or explosion; and

(7) other situations or factors that may pose a threat to public health or welfare or the environment.

*See* 40 C.F.R. § 300.415(b)(2) (1990); 40 C.F.R. § 300.65(b)(1) (1986). Plaintiffs presented no evidence that any of these factors were considered at any time prior to FCA's or Environmental Rehab's asbestos abatement activities, or prior to undertaking any investigation tests for PCB's, oil flammability or the underground storage tanks.

■ 43. Remedial actions are long-term actions taken to eliminate the threat, restore environmental quality and provide a permanent remedy. *See Channel Master Satellite Sys. Inc.*, 748 F.Supp. at 385; *Am-*

*land Prop.*, 711 F.Supp. at 795. "The courts have consistently found that the removal category was to be used in that limited set of circumstances involving a need for rapid action, while non-urgent situations are to be addressed as remedial actions". *Channel Master Satellite Sys. Inc.*, 748 F.Supp. at 385. *See also Ambrogi*, 750 F.Supp. at 1240; *Amland Properties Corp.*, 711 F.Supp. at 795 ("[r]emoval actions are to be taken in response to an immediate threat to the public welfare or to the environment"). The absence of need for rapid action or threat to public welfare or the environment renders an action remedial. *Gussin Enterprises, Inc. v. Rockola*, No. 89–C–4742, 1993 WL 114643, 1993 U.S.Dist. LEXIS 4579 (N.D.Ill. April 13, 1993). The appropriate characterization of a response action turns on the permanence of its effect. *Id.* As noted, to the extent plaintiffs' actions to date can possibly be claimed to fall within the CERCLA umbrella—and this Court has concluded previously that they do not—they would more properly be CERCLA remedial actions.

44. In *U.S. Steel*, the Court set out a number of factors to be used in characterizing a response action as a removal or remedial action, which include: 1) the exigency of the release or threatened release; 2) the cost and duration of that response; 3) the complexity of the action taken; and 4) the nature of the action taken. *U.S. Steel*, 1992 WL 229252, p. 10. From this the plaintiff asserts that since both of its response actions, in the power plant and the pumphouse, lasted a relatively short period of time and were a combined cost of approximately $200,000.00, that these response actions must be categorized as removals rather than remedial actions.

45. It is this Court's findings that in the face of all the other circumstances the cost and duration are the least important factors in determining whether a response action should be categorized as a removal or remedial action. Here, there was no testimony of any kind that there was any urgency in the removal of this asbestos, except that timely removal of the asbestos would further Slay's business interests. Also, it is clear that response action was not a "patch job" or a temporary solution to the environmental situation at the Site. Rather, this was a complete "removal" of all of the asbestos in the effected portions of the facility. Therefore, the Court finds that this was a permanent solution to this potential environmental problem and thus these response costs were for a remedial action.

46. 40 C.F.R. § 300.71(a)(2)(ii) states that a remedial action will be consistent with the NCP if the party:

(A) Provides for appropriate site investigation and analysis of remedial alternatives as required under § 300.68;

(B) Complies with the provisions of paragraphs (e) through (i) of § 300.68;

(C) Selects a cost-effective response; and

(D) Provides an opportunity for appropriate public comment concerning the selection of a remedial action consistent with paragraph (d) of § 300.67 unless compliance with the ... appropriate State and local requirements ... provides a substantially equivalent opportunity for public involvement in the choice of remedy.

47. The 1985 NCP provides that for a remedial action an initial analysis of the release must be performed, which "shall indicate the extent to which the release or threat of release may pose a threat to public health or welfare or the environment." 40 C.F.R. § 300.68(e)(1). The 1985 NCP also specifies a set of 15 different factors that should be "assessed in determining whether and what type of remedial and/or removal actions will be considered." 40 C.F.R. § 300.68(e)(2). Those factors to be assessed include the population at risk, routes of exposure, hydrogeology, current and potential groundwater use, extent to which contamination levels at the site exceed relevant federal and state standards, and the likelihood of further releases. Plaintiffs performed no such analysis and offered no testimony that they considered any of these factors at all prior to spending the monies they seek to recover in this action. Failure to consider these factors bars recovery of response costs. *See e.g., Channel Master Satellite Sys. Inc.*, 748 F.Supp. at 388–389; *Amland*, 711 F.Supp. at 799–800.

48. Notice to the public and opportunity to comment must be provided regardless of whether a removal or remedial action is performed. *See* 40 C.F.R. § 300.700(c)(6)(6) (1990). Again, plaintiffs took no effort to give notice to or to involve the public in any meaningful way before they undertook their abatement efforts. They did not even seek input from any federal, state or local agencies before taking action.

49. Plaintiffs failure to provide an opportunity for public comment bars their recovery. *See Sherwin–Williams Co. v. City of Hamtramck*, 840 F.Supp. 470 (E.D.Mich. 1993) (failure to provide public meetings and opportunity to participate in decision behind remedial actions was a "material and substantial departure from the NCP" and bars recovery of response costs—regulatory involvement is not a substitute for public comment); *Gussin Enterprises, Inc. v. Rockola*, 1993 WL 114643, 1993 U.S.Dist. LEXIS 4579 (N.D.Ill. April 13, 1993). *See also County Line Investment Co. v. Tinney*, 933 F.2d 1508, 1514 (10th Cir.1991) (a remedial action is not in substantial compliance with the 1990 NCP if there has been no opportunity for public comment).

50. Plaintiffs performed none of the NCP's steps prior to their asbestos abatement or their PCB, flammable fluids or underground storage tank investigations. Plaintiffs did not create a cleanup plan or any decisional document which explained the reasons for their activities, evaluated public health risks, or assessed remedial alternatives to the selected remedy. Due to their failure to follow any of the specific requirements of the NCP, plaintiffs' costs are not consistent with the NCP and, therefore, not recoverable. *See Channel Master Satellite Sys. Inc.*, 748 F.Supp. at 379–380 (E.D.N.C. 1990) (failure to make any effort to comply with the NCP in its cleanup plan bars cost recovery—plaintiffs failed to analyze impact of cleanup method on public health or environment, evaluate public health risks posed by the contaminants at issue, or reference any federal regulations in preparing its cleanup plan). *Ambrogi*, 750 F.Supp. at 1258 (investigative costs are not recoverable where consistency with NCP—a required prerequisite—has not been demonstrated).

51. This Court concludes that because plaintiffs were only able to prove one of the four *prima facie* elements necessary to recover response costs under CERCLA, they have failed to satisfy their burden of proof with respect to all past and future actions at the Cahokia Power Plant. Accordingly, the plaintiffs cannot recover under CERCLA.

### 6. U.E. Has Established a Third Party Defense to Liability Under CERCLA.

52. No liability under § 9607(a) can be imposed if the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by an act or omission of a third party. 42 U.S.C. § 9607(b). Section 9607(b) affords a complete defense to CERCLA liability. *In re Hemingway Transport Inc. et al v. Kahn*, 993 F.2d 915, 932 (1st Cir.1993). *See also Environmental Transportation Systems, Inc. v. ENSCO*, 969 F.2d 503, 507 n. 3 (7th Cir.1992). To establish a defense under § 9607(b)(3), a defendant must demonstrate that: (1) the third party was not an employee or agent; (2) the acts or omissions of the third party did not occur in connection with a direct or indirect contractual relationship to the defendant; (3) a third party was the sole cause of the release or threatened release of hazardous substances; (4) the defendant exercised due care with respect to the hazardous substances and took precautions against foreseeable acts and omissions of the third party. *See Kelley v. Thomas Solvent Co.*, 714 F.Supp. 1439, 1466 (W.D.Mich.1989).

53. At all times relevant hereto, Sarnelli and G & S were acting as independent entities and not as agents of U.E. Sarnelli's salvaging activities occurred "in connection with" and pursuant to the Slay Warehousing/G & S real estate contract and the Slay/Sarnelli Lease and Easement Agreement which expressly contemplated and provided for salvaging activities to occur at the Site. Slay had the ability, the opportunity and the obligation as owner/lessor to control Sarnelli's activities at the Site. Ownership implies authority to control, even if that authority is not exercised. *United States v.*

*Velsicol Chemical Corp.,* 1988 U.S.Dist. LEXIS 17123 (W.D.Tenn.1988).

■ 54. Under CERCLA, "sole cause" means proximate or legal cause. *Lincoln Properties v. Norman Higgins,* 823 F.Supp. 1528, 1540 (E.D.Ca.1992). It is uncontroverted that Sarnelli's salvaging operations and Schwartz's subsequent rehab were the sole cause of the release of asbestos of which plaintiffs now complain. "But for" Sarnelli's and Schwartz's operations and what plaintiffs claim were their failure to comply with federal regulations, asbestos would not have been released at the Site.

55. Renovation projects involving asbestos are regulated under the NESHAP regulations of the Clean Air Act. NESHAP requirements apply to both the facility owner and the contractor:

> The facility owner or operator, by purchasing the services of the demolition or renovation contractor, acquires ownership and control of the operation and would, therefore, be the "owner" for the purposes of this standard [NESHAP]. Therefore, this standard applies to both the facility owner or operator.

49 *Fed.Reg.* 13658 (April 5, 1984). (Defendant's Exh. HT). Sarnelli was aware of these regulations and informed both Eugene Slay and EPA of his intent to abide by the NESHAP requirements. U.E. had no authority to supervise Sarnelli's activities. Schwartz was not even aware of the regulations, although he should have been as should have other Slay employees. U.E. had no knowledge of or ability to control Schwartz's actions.

56. U.E.'s decision to sell a corporate asset was not the proximate cause of the release of hazardous substances which have purportedly caused plaintiffs' injury. Moreover, Sarnelli's and Slay's violations of the law are not foreseeable acts. Accordingly, U.E. is entitled to the presumption that the removal of equipment from its facility would be coordinated in accordance with applicable regulations. Had Sarnelli and Schwartz done so, there would not have been a "release" of asbestos. Therefore, the Court finds that U.E. has established its third party

defense under 42 U.S.C. § 9607(b) and is not liable under CERCLA.

### 7. Plaintiffs' Cannot Recover Their Attorney's Fees.

57. The plaintiffs seek to recover their attorneys' fees for their CERCLA case. Because, based upon this opinion, they are not prevailing parties, therefore, they are not entitled to recover their attorneys' fees.

## THE ULTRAHAZARDOUS ACTIVITY CLAIM

### 1. Plaintiffs Cannot Establish An Ultrahazardous Activity Claim As A Matter of Law.

58. It is a question of law whether U.E.'s sale in 1979 of a former power plant, full of useless equipment and hazardous substances, to a salvage and demolition contractor constitutes an abnormally dangerous activity for which U.E. is strictly liable. *G.J. Leasing,* 825 F.Supp. at 1373; *See also Indian Harbor Belt R. Co. v. American Cyanamid Co.,* 916 F.2d 1174, 1176 (7th Cir.1990).

59. Substantial precedent exists to find that the Supreme Court of Illinois would treat as authoritative the provision of Section 520 of the Restatement 2nd of Torts ("Restatement") which sets out six factors to guide the Court in determining whether an activity is an abnormally dangerous one. 825 F.Supp. at 1373. *See Indiana Harbor Belt,* 916 F.2d at 1176 (7th Cir.1990); *See also Dominick's Finer Foods, Inc. v. Amoco Oil Co.,* 1993 WL 524808 (N.D.Ill., Dec. 15, 1993); *Continental Building Corp. v. Union Oil of California,* 152 Ill.App.3d 513, 105 Ill.Dec. 502, 504, 504 N.E.2d 787, 789 (1987).

60. These factors are:

(a) Existence of a high degree of risk of some harm to the person, land or chattels of another;

(b) Likelihood that the harm that results from it will be great;

(c) Inability to eliminate the risk by the exercise of reasonable care;

(d) Extent to which the activity is not a matter of common usage;

(e) Inappropriateness of the activity to the place where it was carried on; and

(f) The extent to which its value to the community is outweighed by its dangerous attributes.

61. These factors must be applied on a case by case basis taking all relevant circumstances into consideration. *Schwartzman, Inc. v. Atcheson, Topeka & Santa Fe Railway Co.,* 842 F.Supp. 475 (D.N.M.1993); *Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784, 806 (D.N.J. 1989). Not all of the factors need to apply to the specific situation. *Id.* However, ordinarily, several of the factors must be present for strict liability to attach. Restatement (Second) of Torts § 520, comment f.

62. The only activity U.E. engaged in was to sell an industrial tract of land with a complex of buildings, some of which contained asbestos as a building material. Such activity does not form the basis of an abnormally dangerous activity cause of action. *Cf. Lowrie v. City of Evanston,* 50 Ill.App.3d 376, 8 Ill.Dec. 537, 543, 365 N.E.2d 923, 929 (1977) (building structure is not a "product" within the meaning of § 402A). The fact that the building may have had asbestos, PCBs or any other hazardous substance in it does not compel a different result because strict liability attaches only to abnormally dangerous activities, not substances. *Indiana Harbor Belt R.R. Co. v. American Cyanamid Co.,* 916 F.2d 1174, 1181 (7th Cir. 1990) ("ultrahazardous or abnormal dangerousness is, in the contemplation of law at least, a property not of substances, but of activities.") "[I]f the rule were otherwise, virtually any commercial activity involving substances which are dangerous in the abstract automatically would be deemed as abnormally dangerous. This result would be intolerable." *City of Bloomington, Ind. v. Westinghouse Electric Corp.,* 891 F.2d 611, 615–17 (7th Cir.1989). *See also Richmond, Fredericksburg and Potomac R.R. Co. v. Davis Inc.,* 787 F.Supp. 572, 575 (E.D.Va. 1992) (strict liability attaches only to activities, not substances—claim based on disposal of PCBs).

63. Where the activity in question is the sale of a product, Illinois courts have declined to impose strict liability in the absence of a showing that the product was "defec-

tive". *See e.g., Martin v. Harrington and Richardson, Inc.,* 743 F.2d 1200, 1202 (7th Cir.1984) (sale of a nondefective product, a handgun, is not an ultrahazardous activity), citing *Riordan v. International Armament Corp.,* 132 Ill.App.3d 642, 87 Ill.Dec. 765, 477 N.E.2d 1293 (1985).

64. The only activity engaged in by U.E. at issue in this case was the sale of real estate. The "activity" which purportedly has caused plaintiffs' injury was Sarnelli's and Schwartz's removal of equipment, not the sale of the Site to G & S. As noted above, U.E. did not participate in or control Sarnelli's or Schwartz's activities at the Site.

65. Moreover, an activity is not abnormally dangerous if the risks therefrom could be limited by the exercise of reasonable care. *See e.g., Anderson v. Marathon Petroleum Co.,* 801 F.2d 936, 939–940 (7th Cir. 1986) (sandblasting was not an abnormally dangerous activity because plaintiff failed to show that people engaged in sandblasting cannot prevent a serious risk of injury by taking precautions). If the danger can be contained or reduced, then an activity is not deemed to be ultrahazardous. *See e.g., Indiana Harbor Belt Co. v. American Cyanamid Co.,* 916 F.2d 1174, 1179–1180 (7th Cir.1990); *Ganton Technologies, Inc. v. Quadion Corp.,* 834 F.Supp. 1018, 1020 (N.D.Ill. 1993) (PCB cleanup activities are not abnormally dangerous activities since there is no basis for believing any risk of harm could not be eliminated by the use of reasonable care; cleanup operations serve valuable and essential social functions of reducing the danger of toxic substances). *See also National R.R. Passenger Corp. v. NYC Housing Authority,* 819 F.Supp. 1271, 1279 (S.D.N.Y.1993) (claim for nuisance based on ultrahazardous activity stemming from asbestos dismissed because asbestos hazard can be limited by exercise of due care).

66. A detailed regulatory scheme has been developed to assure that asbestos removal projects are undertaken safely. Sarnelli was aware of these regulations and informed both Eugene Slay and EPA of his intent to abide by the NESHAP requirements. Moreover, while there is, no doubt,

some risk to health associated with asbestos in buildings, the Court finds the risk not to be a great one which cannot be eliminated by the exercise of reasonable care. As defendant's expert Walter Shifrin credibly testified, health studies show that asbestosis and other illnesses may be an issue for asbestos insulators such as shipyard workers, but there have been no studies showing this to be a problem among abatement contractors since OSHA and EPA began to mandate safe work practices by affected employees. Also, the testimony was undisputed that buildings containing asbestos were bought and sold every day, with some intended for renovation. (Testimony of W. Shifrin, T. Martin, A. Rogers). This is an activity of common usage and the free alienability of such buildings, so that property may be put to other productive uses which employ many people, is a value to the community.

 67. Assumption of the risk of harm from an abnormally dangerous activity is a complete bar to any recovery. Restatement (Second) of Torts § 523, *See e.g., Bowen Engineering v. Estate of Reeve*, 799 F.Supp. 467, 481 (D.N.J.1992). The risk is commonly assumed by one who takes part in the activity himself. *Id.* It is uncontested that Slay knew Sarnelli intended to salvage equipment from the Site and that Schwartz would conduct other rehab activities involving the removal of asbestos. In fact, Slay specifically granted Sarnelli the right to conduct such activities on the property. By entering into a lease agreement with Sarnelli which conferred the right to salvage, Slay, as owner of the property, assumed the risk of those activities. This, too, acts as a total bar to any recovery by plaintiffs.

**2. The Statute of Limitations Bars Plaintiffs' Recovery.**

 68. In Illinois, actions to recover damages to property, real or personal, must commence within five years after the cause of action accrues. Ill.Rev.Stat. Ch. 110 ¶ 13–205. Illinois law adopts a discovery rule in determining the commencement date of the cause of action. *Jackson Jordan Inc. v. Leydig, Voit & Mayer*, 199 Ill.App.3d 728, 145 Ill.Dec. 755, 759, 557 N.E.2d 525, 529, *on*

*appeal* 133 Ill.2d 558, 149 Ill.Dec. 322, 561 N.E.2d 692 (1990), *citing Knox College v. Celotex Corp.*, 88 Ill.2d 407, 58 Ill.Dec. 725, 430 N.E.2d 976 (1981); *Nolan v. Johns-Manville Asbestos*, 85 Ill.2d 161, 52 Ill.Dec. 1, 421 N.E.2d 864 (1981); *Witherell v. Weimer*, 85 Ill.2d 146, 52 Ill.Dec. 6, 421 N.E.2d 869 (1981); *McLane v. Russell*, 159 Ill.App.3d 429, 111 Ill.Dec. 250, 252, 512 N.E.2d 366, 369 (1987); *Lincoln-Way High School Dist. 210 v. Village of Frankfort*, 51 Ill.App.3d 602, 9 Ill.Dec. 884, 890, 367 N.E.2d 318, 324 (1977) (a cause of action accrues from the date upon which plaintiff knew or should have known of the allegedly defective condition of the property).

 69. Under NESHAP, the owner of a facility is obligated to determine whether asbestos containing materials will be impacted prior to conducting renovation of demolition activities. 40 C.F.R. 61. "The very nature of hazardous substances such as asbestos puts individuals controlling the substances on notice that criminal statutes probably regulate the handling and release of the substances." *United States v. Buckley*, 934 F.2d 84, 88–89 (6th Cir.1991). Slay had the statutory obligation to inspect his facility prior to Sarnelli's 1979–1981 salvaging operations and Marvin Schwartz's 1984–1987 rehabilitation of the power plant building. Furthermore, both Schwartz and Sarnelli knew the facility contained large amounts of asbestos and this Court has previously found that the people in plaintiffs' organization knew or reasonably should have known of the presence of asbestos and all other Site conditions after they received the bid specification and inspected the property. This occurred in 1979. Plaintiffs' lawsuit was not filed until 1990, more than a decade later.

70. This Court, being faced with these factors along with those set forth in the findings of fact, must conclude that the plaintiffs' failure to bring their common law claims in a timely manner bars their current action.

71. Considering all of the foregoing factors, this Court concludes that the plaintiffs are unable to recover under the theory of ultrahazardous activity as a matter of law.

### III. Conclusion

The Court, having entered these Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, hereby finds in favor of the defendant and against the plaintiffs on both Count I which seeks damages under CERCLA and also Count IV which seeks damages under the common law theory of ultrahazardous activity. Any motions asserting that an award of attorney's fees is proper, along with supporting documentation of the fees requested are to be submitted to the Court by June 27, 1994. If a response is to be filed thereto, it will be filed by July 11, 1994. The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.