909 F.Supp. 1290 (1995)
YELLOW FREIGHT SYSTEM, INC., Plaintiff,
v.
ACF INDUSTRIES, INC., Defendant.
No. 4:92-CV-2585 CAS.
United States District Court, E.D. Missouri, Eastern Division.
April 10, 1995.
*1291 *1292 *1293 Russell W. Baker, Jr., James H. Andreasen, Samuel Price Logan, Carl H. Helmstetter, Spencer and Fane, Kansas City, MO, for plaintiff.
Eric R. Riess, Thompson and Mitchell, Belleville, IL, Kim Roger Luther, St. Louis, MO, Julie A. Emmerich, St. Louis, MO, for defendant.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
SHAW, District Judge.
This matter came on before the Court for trial in July 1994 on plaintiff Yellow Freight System, Inc.'s ("Yellow Freight") claims for response costs under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675.[1] Based upon the trial of this matter, the Court now sets forth the following findings of fact and conclusions of law on Yellow Freight's CERCLA claim.

FINDINGS OF FACT
1. Defendant ACF Industries, Inc. ("ACF") owned a 49.3-acre tract of real property located along the Mississippi River at 2800 DeKalb Street in St. Louis, Missouri (the "Site") from 1898 through June 1985. The Site is located in a heavily industrialized area.
2. Yellow Freight, which purchased the Site from ACF, asserts a claim under CERCLA for response costs it allegedly expended to investigate and remove polychlorinated biphenyls (PCBs) and asbestos located on Lot 3, an eighteen-acre portion of the Site adjacent to the Mississippi River.
3. ACF or its predecessors had owned and operated the Site as a plant to manufacture railroad cars from 1898 until 1982. From 1982 until the Site was sold, ACF used the Site primarily to manufacture component parts for railcars.
4. During its operations, ACF had used a portion of the Site to remove paint from stencils. ACF conducted a cleanup of that portion, which was listed on the Missouri Registry of Confirmed Abandoned or Uncontrolled Hazardous Waste Sites (the "Missouri Registry") in February 1984. This portion of the Site was identified as a Level 4 site, which meant that the area was properly closed, but continued management was required.
5. ACF desired to sell the Site because changing business conditions had rendered it unable to use the Site in a productive manner.
6. Since approximately 1970, Yellow Freight had maintained its main St. Louis terminal at 400 Barton Street, immediately northwest of the Site.
7. In 1983 and 1984, Yellow Freight looked into the possibility of purchasing other parcels of property in the same vicinity as its Barton Street terminal. One such parcel, commonly referred to as the "Superior Truck" facility, was located across the street from Yellow Freight's terminal. Anheuser-Busch Companies, Inc. ("A-B") purchased the Superior Truck facility.
8. Following the sale of the Superior Truck facility to A-B, Yellow Freight offered to purchase a ten-acre paved portion of the Site, on which there were no buildings. ACF rejected the offer.
9. In late 1984, A-B began negotiations with ACF to purchase the Site. In connection with the negotiations, A-B hired Environmental Science and Engineering, Inc. ("ESE"), an environmental consultant, to conduct an environmental assessment of the Site. The assessment consisted largely of a records review and visual observations made, but involved no sampling activities. ESE's report discussed the presence of thirty operational PCB-containing transformers on the Site, but did not mention asbestos. During this time, Yellow Freight discussed with A-B *1294 the possibility of Yellow Freight purchasing a portion of the Site from A-B if A-B purchased the entire Site.
10. In March 1985, while negotiations were continuing between ACF and A-B, Yellow Freight began negotiations with ACF for the purchase of the entire Site.
11. During negotiations between Yellow Freight and ACF concerning the Site, ACF offered to demolish the buildings on the Site for the additional consideration of Five Hundred Thousand Dollars ($500,000.00). Yellow Freight declined ACF's offer. ACF did not know that Yellow Freight necessarily intended to demolish the buildings on the Site if the sale was completed.
12. By an Agreement for Sale of Real Estate dated April 23, 1985 (the "Agreement"), Yellow Freight purchased the Site from ACF. The sale was closed on June 28, 1985, and the purchase price was Three Million Nine Hundred Fifty Thousand Dollars ($3,950,000).
13. Yellow Freight did not inspect the Site prior to signing the Agreement.
14. Yellow Freight received a copy of the ESE environmental report at the time the Agreement was signed or shortly thereafter.
15. The Agreement provided that "all machinery and equipment used for manufacturing on the premises" was excluded from the sale, but "all machinery and equipment used to operate the buildings, (i.e., HVAC, sprinkler systems, plumbing, underground tanks, electrical, etc.)" was included in the sale. See Schedule A to the Agreement.
16. The transformers on the Site were part of the electrical system and were not machinery or equipment used for manufacturing.
17. The Agreement provided in part as follows:
Seller [ACF] represents that it has no knowledge of any abandoned or uncontrolled hazardous waste site, as defined in Section 260.435 of the Missouri Hazardous Waste Management Law, on the property, except as stated in Schedule B attached hereto. Seller represents that it has no knowledge of any violation on or with respect to said property, of any Federal, State or Local environmental laws. Seller and Buyer [Yellow Freight] each agree to promptly take such action as may be necessary and appropriate to obtain Missouri Department of Natural Resources approval of the within sale pursuant to Section 260.465 of the Missouri Hazardous Waste Management Law.
18. An internal Yellow Freight memorandum dated June 28, 1985 and approved by Yellow Freight's Board of Directors stated that Yellow Freight was purchasing the Site "on an `as-is' basis".
19. Yellow Freight officials conducted a walk-through inspection of the Site after the Agreement was signed, but before the closing. The inspection lasted between one and two hours. Yellow Freight's personnel saw the asbestos and transformers during this inspection.
20. The buildings on Lot 3 contained electrical transformers, capacitors and switch boxes used to operate ACF's manufacturing equipment. Some of the transformers were eight feet tall. Many of the transformers, capacitors and switch boxes contained oils used to transfer heat. The transformers were operational at the time the Agreement was signed.
21. The buildings on Lot 3 also contained insulation and roofing materials, which ACF suspected included asbestos.
22. On June 25, 1985, three days prior to the closing, ACF held an auction of manufacturing equipment and machinery from the plant. Some of the auctioned equipment was never picked up by the purchasers, and as a result, equipment remained on the Site after the sale.
23. In September 1985, Yellow Freight proposed to A-B an exchange of part or all of the Site in return for the Superior Truck facility. A-B rejected the offer.
24. Beginning in 1986, Yellow Freight subdivided the Site into three parcels. Lot 1 consists of the portion of property listed on the Missouri Registry. Lot 2 consists of approximately thirty acres west of the Missouri Pacific Railroad tracks. Lot 3 consists *1295 of approximately eighteen acres east of the railroad tracks and along the Mississippi River.
25. Between June 1985 and 1988, Yellow Freight used a small portion of the Site for parking, but did not utilize the rest of the Site for any purpose. The remainder of the Site was virtually abandoned for this period of time.
26. In 1988, Yellow Freight began to demolish buildings on Lot 2. During the demolition, Yellow Freight removed asbestos-containing materials and transformers containing PCBs from the buildings. Yellow Freight did not demand at any time that ACF reimburse it for costs incurred in the removal of the asbestos-containing materials and transformers from Lot 2.
27. Between 1985 and 1990, Yellow Freight had performed no maintenance on the buildings on the Site. During this period, the buildings were vandalized, holes developed in roofs and windows, and doors were not secured, allowing rain and wind to enter. Vandals also removed materials from the buildings, including copper from transformers.
28. Between 1985 and 1990, Yellow Freight attempted to sell Lots 2 and 3 in an "as is" condition, and advertised Lot 3 as an "excellent industrial site" with buildings on it.
29. In January 1990, Yellow Freight began steps to demolish the buildings on Lot 3. This was the first activity Yellow Freight had undertaken with regard to Lot 3 since its purchase of the Site in 1985.
30. Yellow Freight hired IT Corporation ("IT") to assist in conducting a two-day environmental investigation and sampling at the Site. During the investigation, IT personnel observed at least one transformer that had been tipped over onto the floor of a building, and several transformers from which the tops had been removed.
31. During the on-site investigation, IT personnel obtained samples of fluids suspected to contain PCBs, which were taken from transformers, capacitors, switch boxes, sumps and "pit" areas. The pit areas contained a substantial amount of debris. Yellow Freight also took samples of certain soils underneath outdoor transformers, and "soils" from the floor areas within buildings, which were actually layers of dirt that had accumulated over the concrete floors. The samples were sent to an IT lab in Knoxville, Tennessee and analyzed there.
32. The same IT sampling team also conducted sampling of insulation, floor tiles, bricks, roofing materials and materials covering outdoor pipes, suspected to contain asbestos. The samples were sent to an IT lab in Cincinnati, Ohio and analyzed there.
33. After the samples were analyzed for PCBs and asbestos, Lowell Wille prepared a written report of analysis dated March 21, 1990 (the "IT Report"), summarizing the results. The IT Report noted the presence of asbestos. The IT Report did not, however, indicate the condition of the alleged asbestos-containing materials, i.e., whether the asbestos was "friable"  readily crumbled or brittle.
34. The IT Report showed low levels of PCBs in some transformers and machinery pits. Of all of the samples taken, only three showed the presence of PCBs in excess of 50 parts per million (ppm): An oil sample from inside a transformer located outside of Building 317 (South) (290 ppm); a water sample from a floor sump in Building 87 (62 ppm); and a composite sample of debris and "soil" from the floor of the northwest end of Steel Plant Area 1-S2 (59 ppm).
35. The IT Report did not discuss the extent to which the PCBs or asbestos posed a threat to public health or welfare or the environment. The IT Report briefly discussed the geology of the site and its location in a floodplain, did not discuss the population at risk, routes of exposure, current and potential groundwater use, the extent to which contamination levels at the site exceed relevant federal and state standards, and the likelihood of further releases.
36. Prior to removing any asbestos or PCBs from Lot 3, Yellow Freight and its contractors notified local fire officials, city officials and the Environmental Protection Agency of the intended removal. No public hearings were held on the cleanup, and Yellow *1296 Freight did not notify immediately affected citizens or offer other opportunity for public comment prior to beginning its removal actions.
37. Yellow Freight removed PCBs from Lot 3 because it intended to demolish the buildings on Lot 3.
38. Yellow Freight removed all transformers, the fluids they contained, and all PCBs from sumps, machinery pits, debris, "soils" and floors from the buildings on Lot 3 between March 12 and 14, 1990.
39. Yellow Freight incurred $83,595.56 in costs to investigate and confirm the presence of PCBs and asbestos on Lot 3.
40. Yellow Freight incurred $119,538.46 in costs to remove PCBs from Lot 3.
41. Yellow Freight introduced evidence that some asbestos-insulated pipes were located outside the buildings on Lot 3. Evidence at trial showed that the asbestos insulation was exposed to the elements and was breaking away from the pipes. Yellow Freight did not establish, however, that the asbestos was breaking away from the pipes at the time that it purchased the Site.
42. Yellow Freight removed asbestos from buildings on Lot 3 in preparation for its intended demolition of the buildings.
43. Yellow Freight's removal of asbestos from buildings on Lot 3 occurred in July through September of 1990.
44. Yellow Freight incurred costs of $139,033.00 for removal of asbestos from Lot 3.
45. The only evidence Yellow Freight presented of the process or reasons behind its choice of abatement remedies was that it considered landfilling the PCB-containing transformers rather than incineration but chose the latter as lower in cost, and that it obtained competitive bids for asbestos removal. Yellow Freight did not present evidence that it considered taking no action with regard to the hazardous materials on the Site.
46. Yellow Freight did not bring any PCBs or asbestos onto the Site at any time.

CONCLUSIONS OF LAW
In order to prevail in a private cost recovery action under CERCLA, a plaintiff bears the burden to establish that:
(a) The site in question is a "facility" as defined by 42 U.S.C. § 9601(9);
(b) There was a "release" or "threatened release" of any "hazardous substance" from the facility;
(c) Such release or threatened release has caused the plaintiff to incur response costs that were necessary and consistent with the national contingency plan under 42 U.S.C. §§ 9607(a)(4) and (a)(4)(B); and
(d) The defendant is a "covered person" under 42 U.S.C. § 9607(a)(1)-(4).
See 42 U.S.C. § 9607(a); Environmental Transp. Systems, Inc. v. ENSCO, Inc., 969 F.2d 503, 506 (7th Cir.1992); 3550 Stevens Creek Assoc. v. Barclays Bank of California, 915 F.2d 1355, 1359 (9th Cir.1990), cert. denied, 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991) (Stevens Creek); Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 669 (5th Cir.1989).
A. Facility. The term "facility" is broadly defined in 42 U.S.C. § 9601(9) as:
(A) any building, structure, installation, equipment, pipe or pipeline ..., well, pit, pond, lagoon, impoundment ..., or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.
In the present case, the buildings on Lot 3 are facilities within the meaning of CERCLA. PCBs are hazardous substances within the meaning of CERCLA, see 40 C.F.R. § 302.4, Table 302.4, pp. 256-57, which were deposited or placed in the buildings. Asbestos is a hazardous substance under CERCLA where it is friable and present in reportable quantity. 40 C.F.R. § 302.4, Table 302.4, pp. 236, 281. Structures containing asbestos building materials satisfy the broad definition of "facility" in CERCLA. Kane v. United States, 15 F.3d 87, 89 (8th Cir.1994) (citing Dayton Independent School District v. United States Mineral Products Co., 906 F.2d 1059, 1065 & n. 4 (5th Cir.1990)); People of *1297 the State of California v. Blech, 976 F.2d 525, 527 n. 1 (9th Cir.1992) (Blech).
B. Release. Yellow Freight has also established the second required element of its cost-recovery action. The term "release" is defined in 42 U.S.C. § 9601(22) as:
[A]ny spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)....
With regard to asbestos, Yellow Freight established that asbestos was present outside the buildings on Lot 3, was exposed to the elements, and was breaking away from piping. The Court concludes this constitutes a release or threatened release of asbestos into the environment within the meaning of 42 U.S.C. § 9601(22).[2]
With regard to PCBs, Yellow Freight established that PCBs were present in machinery pits, sumps and "soil" on the floors inside the buildings on Lot 3. Placement of hazardous wastes inside an enclosed manufacturing facility may constitute disposal of such waste into or on any land so as to satisfy the CERCLA definition. See Westwood Pharmaceuticals, Inc. v. Nat'l. Fuel Gas Distribution Corp., 737 F.Supp. 1272, 1278 (W.D.N.Y.1990), aff'd, 964 F.2d 85 (2d Cir.1992); Amland Properties Corp. v. Aluminum Co. of America, 711 F.Supp. 784, 791 (D.N.J.1989) (Amland); BCW Associates, Ltd. v. Occidental Chemical Corp., 1988 WL 102641 at *17 (E.D.Pa.1988); Emhart Industries, Inc. v. Duracell Int'l., Inc., 665 F.Supp. 549, 574 (M.D.Tenn.1987).
Although Yellow Freight offered no proof that there had been a documented release of PCBs into the environment outside the buildings on Lot 3, the Court concludes the unsecured presence of PCBs in sumps, machinery pits and "soils" on floors constitutes a threatened release. A person merely walking in the buildings could conceivably carry PCBs into the environment by means of his shoes or clothing. See BCW Associates, 1988 WL 102641 at *17. Further, courts have found that PCBs on concrete flooring, if left unremedied, can eventually leach through to the soil.[3] See Amland, 711 F.Supp. at 793, and cases discussed therein. In addition, the presence of numerous transformers containing PCBs in the buildings on the Site constitutes a threatened release. Amland, 711 F.Supp. at 793 n. 8 and cases cited therein.
C. Covered Person. Omitting for the moment the third required element of Yellow Freight's case, the Court turns to the issue whether ACF is a "covered person" under 42 U.S.C. § 9607(a). In pertinent part, this section defines "covered person" as:
(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous substances were disposed of,
(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, ... of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances,
. . . . .
Yellow Freight contends that ACF is a covered person under 42 U.S.C. § 9607(a)(2) and (3) because it owned the Site at the time hazardous substances were disposed of, and because it arranged for disposal of hazardous substances when it sold the Site to Yellow Freight.
The Court concludes Yellow Freight has failed to meets its burden to establish *1298 that ACF disposed of hazardous substances at the time it owned the Site, under 42 U.S.C. § 9607(a)(2). With regard to asbestos, there was no proof that any friable asbestos entered the environment prior to the time ACF sold the Site in 1985. Absent such proof, Yellow Freight cannot establish that ACF is a covered person with regard to asbestos. A plaintiff cannot recover under CERCLA for mere removal from a building of asbestos which is part of its structure. See Blech, 976 F.2d at 527; Stevens Creek, 915 F.2d at 1362-65; First United Methodist, 882 F.2d at 867 n. 6.
With regard to PCBs, Yellow Freight has established that it did not bring PCBs onto the Site. The Court cannot conclude, however, that Yellow Freight has met its burden to show ACF was responsible for the presence of PCBs in the buildings on Lot 3. As the Court has found, the transformers were in operating condition when Yellow Freight purchased the Site, but Yellow Freight virtually abandoned the buildings on Lot 3 for a period of five years after the purchase, during which time vandals gained access to the buildings and the transformers. With respect to PCBs detected in machinery pits, Yellow Freight's witness Sandra Stanish testified that because some of the auctioned machinery was never picked up by the purchasers, and due to the vandalism that occurred, it was impossible to determine the time when alleged PCB-containing fluids leaked into the pits. Therefore, the Court cannot conclude that a release of PCBs occurred during ACF's ownership.
The Court also concludes ACF's sale of the Site to Yellow Freight did not constitute an "arrangement for disposal" of hazardous substances under 42 U.S.C. § 9607(a)(3). Whether a party arranged for disposal of hazardous substances such that it incurs liability under CERCLA is determined on a case-by-case basis. Florida Power & Light Co. v. Allis Chalmers Corp., 893 F.2d 1313, 1317 (11th Cir.1990).
Yellow Freight's principal arguments are that ACF had used the Site for manufacturing but had ceased manufacturing operations prior to the sale, rendering useless the transformers left at the Site. Yellow Freight is not in the business of manufacturing, and it did not purchase the Site as a functional manufacturing facility. The buildings were old and dilapidated, and of no use to ACF or Yellow Freight. Thus, ACF avoided disposing of materials for which it had no use by leaving them for Yellow Freight, which also had no use for them.
ACF counters that there was no evidence it did anything other than sell a useable parcel of industrial land it could no longer use due to changing business demands. ACF asserts that Yellow Freight's advertisement of Lot 3 as an "excellent industrial site" demonstrates the Site's continued utility.
A disposal requires an affirmative act of discarding a substance as waste and occurs only at the point where there is a threat that hazardous wastes will be emitted into the environment. AM Int'l, Inc. v. Int'l Forging Equipment Corp., 982 F.2d 989, 998 (6th Cir.1993); Stevens Creek, 915 F.2d at 1362; Prudential Ins. Co. of America v. United States Gypsum Co., 711 F.Supp. 1244, 1253-56 (D.N.J.1989). As previously discussed, Yellow Freight presented no evidence of a threat of release of any hazardous wastes into the environment at the time the Site was sold, and the evidence indicated the threat of release occurred after Yellow Freight purchased the site and allowed the buildings to deteriorate and be vandalized. Thus, the Court concludes there is no proof that disposal occurred.
Further, a sale does not constitute an arrangement for disposal unless the seller is primarily motivated to dispose of hazardous substances through the sale. See Edward Hines Lumber Co. v. Vulcan Materials Co., 685 F.Supp. 651, 656 (N.D.Ill.), aff'd, 861 F.2d 155 (7th Cir.1988); see also Florida Power, 893 F.2d at 1317 ("If a party merely sells a product, without additional evidence that the transaction included an `arrangement' for the ultimate disposal of a hazardous substance, CERCLA liability would not be imposed.") The mere fact that a seller removes equipment from a building does not render the sale a disposal, if the building retains usefulness for some purpose. See G.J. Leasing Co. Inc. v. Union Electric Co., *1299 854 F.Supp. 539, 560 (S.D.Ill.1994) (G.J. Leasing).
There was no evidence ACF intended to dispose of hazardous substances by selling the Site. Rather, ACF officials testified credibly that the sale was motivated by business considerations relating to ACF's inability to make continued productive use of the Site. The Court has found that ACF did not know Yellow Freight would necessarily demolish the buildings on the Site. In fact, Yellow Freight did not demolish any buildings on the Site until three years after the sale, and did not demolish the buildings on Lot 3 until five years thereafter. At the time of sale, the buildings were in suitable condition for continued use, though not necessarily as a manufacturing facility.
Therefore, the Court concludes Yellow Freight has failed to establish that ACF is a "covered person" pursuant to 42 U.S.C. § 9607(a)(3). As Yellow Freight has not established each required element of its prima facie case, it has not established ACF's liability for response costs under CERCLA.
D. Response Costs. Even if ACF were a covered person subject to CERCLA liability, the Court concludes Yellow Freight has also failed to establish the third element of its prima facie case, that the costs associated with its cleanup of PCBs and asbestos were both necessary and consistent with the national contingency plan under 42 U.S.C. §§ 9607(a)(4) and (a)(4)(B).
CERCLA was not intended "to make injured parties whole or to create a general vehicle for tort actions." G.J. Leasing, 854 F.Supp. at 561 (citations omitted). The expenses which may be recovered under CERCLA are limited in private cost-recovery actions to those identified and defined as "necessary costs of response incurred ... consistent with the national contingency plan" ("NCP"), 42 U.S.C. § 9607(a)(4)(B). Yellow Freight must prove affirmatively that its response costs were both necessary and consistent with the NCP in order to establish the third element of its prima facie case. County Line Investment Co. v. Tinney, 933 F.2d 1508, 1512 (10th Cir.1991) (County Line).

1. Necessary Response Costs.

To show that response costs were necessary, Yellow Freight must demonstrate that it was responding to a threat to public health or the environment. G.J. Leasing, 854 F.Supp. at 561-62 (citing Amoco Oil Co., 889 F.2d at 669-70 (discussing an Environmental Protection Agency ("EPA") response action)). A theoretical threat is not enough. To be necessary under CERCLA, Yellow Freight must establish that an actual and real public health threat exists prior to initiating a response action. G.J. Leasing, 854 F.Supp. at 562 (citing Matter of Bell Petroleum Services, Inc., 3 F.3d 889, 904-06 (5th Cir.1993) (EPA response action)). Where the conditions at a site do not pose any plausible threat to human health or the environment, the response cannot be deemed necessary, and recovery must be denied. Amoco Oil Co., 889 F.2d at 670.
In this case, the evidence showed that Yellow Freight had business reasons for undertaking the investigation, sampling and abatement actions on the Site, i.e., to place the Site in a condition that was useful to it in its trucking operations. To the extent Yellow Freight's actions were taken for purposes other than responding to a public health threat, it cannot establish that its costs expended were necessary under CERCLA. Compare G.J. Leasing, 854 F.Supp. at 562.
Yellow Freight attempts to rely on the opinion of its expert Dr. Ball for the proposition that the cleanup should be characterized as a removal operation. The classification of a cleanup is an issue of law, however, which is not appropriate for expert testimony. Channel Master, 748 F.Supp. at 386 (citing Marx & Co., Inc. v. Diners' Club, Inc., 550 F.2d 505, 509-10 (2d Cir.1977), cert. denied, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977)). There was no evidence of an immediate threat to public health or the environment at the Site which would cause Yellow Freight's costs to be necessary. Nor was there any persuasive evidence of the possibility or likelihood that PCBs or asbestos in the small quantities allegedly found would migrate into the Mississippi River. *1300 Yellow Freight presented no evidence of water contamination which threatened public health. Yellow Freight did not analyze the river water to determine whether an actual public health threat existed.
Further, Yellow Freight removed PCBs and asbestos from Lot 2 in 1988. If Yellow Freight believed there was any real threat posed, it would and should have removed all PCBs and asbestos from Lot 3 at the time it removed those substances from Lot 2. See, e.g., Artesian Water Co. v. Government of New Castle County, 659 F.Supp. 1269, 1278 (D.Del.1987), aff'd, 851 F.2d 643 (3d Cir.1988) (Artesian Water); Channel Master, 748 F.Supp. at 385 (plaintiff's inaction for two years after learning of hazardous wastes belied characterization of site conditions as urgent or exigent).
The Court concludes that Yellow Freight has failed to establish that its costs are "necessary" costs of response under CERCLA.
2. National Contingency Plan. The NCP is a series of regulations promulgated by the EPA defining standards and procedures for hazardous waste site abatement actions. In order to prove its case, Yellow Freight must also show that its response costs were consistent with the NCP, as required by 42 U.S.C. § 9607(a)(4)(B). See United States v. Northeastern Pharmaceutical & Chemical Co., 810 F.2d 726, 747 (8th Cir.1986).
A response cost is recoverable under CERCLA only if it is consistent with the NCP in effect at the time the cost was incurred. See Wickland Oil Terminals v. Asarco, Inc., 792 F.2d 887, 891 (9th Cir.1986); City of Philadelphia v. Stepan Chemical Co., 748 F.Supp. 283, 290 (E.D.Pa.1990). The 1985 NCP was promulgated on November 20, 1985. 50 Fed.Reg. 47912. Strict compliance is required in order to establish consistency with the 1985 NCP. See County Line, 933 F.2d at 1513-14. The 1990 NCP became effective April 9, 1990, and applies to costs incurred after April 8, 1990. 55 Fed.Reg. 8666 (March 8, 1990); County Line, 933 F.2d at 1511 n. 5; Tri-County Business Campus Joint Venture v. Clow Corp., 792 F.Supp. 984, 990 (E.D.Pa.1992). Substantial compliance with the terms of the 1990 NCP is sufficient to establish consistency. County Line, 933 F.2d at 1513-14.
In the present case, the 1985 NCP applies to costs incurred through April 8, 1990. Thus, the 1985 NCP applies to all of Yellow Freight's investigation and cleanup costs relating to PCBs. With respect to asbestos, the 1985 NCP applies to costs associated with the January 1990 investigation, but the 1990 NCP applies to the actual cleanup of asbestos, which occurred in July through September of 1990.
The NCP provides detailed procedural requirements for two types of cleanups: removal and remedial actions. A removal action is an interim action undertaken in an emergency situation to address an immediate threat, while a remedial action provides a permanent solution to an environmental problem. G.J. Leasing, 854 F.Supp. at 564; Channel Master Satellite Systems, Inc. v. JFD Electronics Corp., 748 F.Supp. 373, 385 (E.D.N.C.1990) (Channel Master); Ambrogi v. Gould, Inc., 750 F.Supp. 1233, 1240 (M.D.Pa.1991). The designation of a removal action is limited to circumstances involving a need for prompt action. All non-urgent situations are to be considered remedial actions. G.J. Leasing, 854 F.Supp. at 565; Channel Master, 748 F.Supp. at 385.
In the present case, Yellow Freight's response does not qualify as a removal action, because Yellow Freight identified no urgent situation or "immediate threat" that required a removal action. Amland, 711 F.Supp. at 795. Yellow Freight's abatement actions were clearly designed to eliminate any threat from the presence of asbestos and PCBs on the Site, restore environmental quality, and provide a permanent solution so that it could utilize the Site in its business.
A private party remedial action will be deemed consistent with the 1985 NCP if the remediating party:
(A) Provides for appropriate site investigation and analysis of remedial alternatives as required under § 300.68;
(B) Complies with the provisions of paragraphs (e) through (i) of § 300.68;

*1301 (C) Selects a cost-effective response; and
(D) Provides an opportunity for appropriate public comment concerning the selection of a remedial action consistent with paragraph (d) of § 300.67 unless compliance with the ... appropriate State and local requirements ... provides a substantially equivalent opportunity for public involvement in the choice of remedy.
40 C.F.R. § 300.71(a)(2)(ii).
The 1985 NCP provides that a site investigation of the release must be performed, which "shall indicate the extent to which the release or threat of release may pose a threat to public health or welfare or the environment." 40 C.F.R. § 300.68(e)(1). The site investigation phase must involve sufficient sampling, analysis and data collection to provide reliable information on the nature, extent and amount of contamination. The 1985 NCP also lists fifteen factors which "should be assessed in determining whether and what type of remedial and/or removal actions will be considered." 40 C.F.R. § 300.68(e)(2). These factors include the population at risk, routes of exposure, hydrogeology, current and potential groundwater use, the extent to which contamination levels at the site exceed relevant federal and state standards, and the likelihood of further releases.
Yellow Freight failed to establish that it conducted adequate site investigations encompassing the NCP factors in its investigation of PCBs and its January 1990 investigation of asbestos as required by 40 C.F.R. § 300.68. The IT Report does not appear to have been undertaken pursuant to any plan, other than Yellow Freight's plan to demolish buildings on the Site in preparation for use of the land. Although Yellow Freight had IT obtain numerous samples from the Site, no effort was made to evaluate the risk to public health or the environment presented by Site conditions. Nor does the IT Report outline the kinds of cleanup methods which might be appropriate. Further, Yellow Freight has failed to establish that it considered any or all of the appropriate factors from 40 C.F.R. § 300.68(e)(2).[4] These failures render Yellow Freight's action inconsistent with the NCP.
Further, 40 C.F.R. § 300.68(f) requires the development of five alternative methods of cleanup, meaning that alternatives be considered in some detail. Yellow Freight has failed to establish the process or reasons it used to arrive at its choice of remedies, except to assert that it considered landfilling the transformers rather than incineration but chose the latter as lower in cost, and obtained competitive bids for asbestos removal. In addition, there is no evidence that Yellow Freight determined any appropriate cleanup level or cleanup guidelines applicable to PCBs as required by 40 C.F.R. § 300.68(f)(1)(ii), because it incinerated all oils or fluids encountered, though not required to do so.[5] Thus, the evidence presented does not establish that Yellow Freight developed alternatives as required by the NCP, or that it considered the "no action" alternative, which must be given "close and detailed scrutiny". Channel Master, 748 F.Supp. at 389.
In sum, Yellow Freight failed to present evidence that it considered, much less strictly complied with, the 1985 NCP prior to beginning its PCB investigation and abatement work and asbestos investigation at the Site. Yellow Freight's failure to take action consistent with the 1985 NCP bars its recovery under CERCLA, and ACF is not liable for PCB investigation or response costs or asbestos investigation costs. See Channel Master, 748 F.Supp. at 379-80.
Moreover, 40 C.F.R. § 300.67(d) requires that the party conducting a cleanup provide the opportunity for appropriate public comment on its activities. Yellow Freight *1302 provided no opportunity for public comment prior to beginning its response action. Although Yellow Freight notified local officials and the EPA in advance, notification of public officials does not constitute an adequate substitute for public comment, at least where such notification does not offer "substantially equivalent" opportunities for public involvement. Channel Master, 748 F.Supp. at 389-90, 392-93 and cases cited therein; Sherwin-Williams Co. v. City of Hamtramck, 840 F.Supp. 470, 477 (E.D.Mich.1993) (failure to provide public meetings and opportunity to participate in decision behind remedial actions was a "material and substantial departure from the NCP" and barred recovery of response costs; regulatory involvement is not a substitute for public comment); County Line, 933 F.2d at 1514-15; Gussin Enterprises, Inc. v. Rockola, 36 Env't Rep.Cas. (BNA) 1903, 1906, 1993 WL 114643 *4 (N.D.Ill.1993); but cf. General Electric Co. v. Litton Business Systems, Inc., 715 F.Supp. 949, 952, 961 (W.D.Mo.1989), aff'd, 920 F.2d 1415 (8th Cir.1990), cert. denied, 499 U.S. 937, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991) (input of the Missouri Department of Natural Resources (MDNR) served as a substitute for public comment, where the cleanup site was discussed in at least three public meetings of the Hazardous Waste Management Commission before and during the cleanup, a consent decree was entered between the owner and MDNR, MDNR monitored the appropriateness of the action throughout the cleanup, and the EPA found the enforcement action by the state was needed for the site.)
The Court concludes that under the facts of this case Yellow Freight's failure to provide an opportunity for public comment on its remedial action is inconsistent with the 1985 NCP. This inconsistency also bars Yellow Freight's recovery on all PCB investigation and response costs and asbestos investigation costs. See Channel Master, 748 F.Supp. at 389-90; Amland, 711 F.Supp. at 790, 794; Artesian Water, 659 F.Supp. at 1291-92.
With respect to the asbestos cleanup, the 1990 NCP contains more detailed requirements for remedial evaluations and cleanups, which are contained primarily in 40 C.F.R. §§ 300.420-.435. As discussed above with regard to the PCB investigation and response, Yellow Freight failed to conduct an adequate site investigation and evaluation regarding the need to remove the asbestos, the extent of the threat to the public health or environment, cleanup alternatives, and also failed to provide the opportunity for public comment. Therefore, Yellow Freight has failed to show substantial compliance with the 1990 NCP and its recovery for the costs of asbestos removal is also barred. See, e.g., County Line, 933 F.2d at 1514-15.
The Court concludes that because Yellow Freight was able to establish only two of the four prima facie elements necessary to a recovery of private response costs under CERCLA, it has failed to satisfy its burden of proof with respect to any response actions it took at the Site. Thus, Yellow Freight cannot recover from ACF under CERCLA.
Accordingly,
IT IS HEREBY ORDERED that judgment is entered in favor of defendant ACF Industries, Inc. and against plaintiff Yellow Freight System, Inc., on Counts I and II, plaintiff's response cost and declaratory judgment claims under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601-9675.
An appropriate judgment will accompany this memorandum and order.

JUDGMENT
In accordance with the Findings of Fact, Conclusions of Law and Order of this date and incorporated herein,
IT IS HEREBY ORDERED, ADJUDGED and DECREED that judgment is entered in favor of defendant ACF Industries, Inc. and against plaintiff Yellow Freight System, Inc., on Counts I and II and plaintiff's complaint, which are plaintiff's response cost and declaratory judgment claims under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601-9675.
NOTES
[1] Yellow Freight's claims under the Resource Conversation and Recovery Act of 1976, 42 U.S.C. §§ 6901-6987, and under Missouri common law for strict liability based on ultrahazardous activity (Counts III-VI), were dismissed by order dated July 7, 1994. Yellow Freight's remaining state law claims for non-contractual indemnity and contribution (Counts VII and VIII) were tried before a jury. The jury returned its verdict in favor of Yellow Freight on July 20, 1994, as set forth in the Judgment dated September 12, 1994.
[2] These facts distinguish the instant case from those which hold that there is no private cause of action under CERCLA for recovery of the cost of removing asbestos building materials from a structure when no release of hazardous substances outside the structure is alleged. Blech, 976 F.2d at 527; Stevens Creek, 915 F.2d at 1362-65; First United Methodist Church v. United States Gypsum Co., 882 F.2d 862, 867 n. 6 (4th Cir.1989), cert. denied, 493 U.S. 1070, 110 S.Ct. 1113, 107 L.Ed.2d 1020 (1990).
[3] Yellow Freight presented no evidence at trial that PCBs in the buildings on Lot 3 had migrated into the floors or leached into the soils beneath the buildings.
[4] The IT Report of Analysis briefly discusses the nature of the Site's geology and location on a flood plain, but does not indicate that any tests were done concerning, for example, soil permeability or hydrologic gradients.
[5] As an example of an appropriate cleanup level, the PCB Spill Cleanup Policy identifies 50 ppm as an appropriate cleanup level for a site such as this. See 40 C.F.R. § 761.125(c)(2)(ii). As previously discussed, only three of the numerous samples collected on the Site contained PCBs in excess of 50 ppm.